COMMITTEE TO ELECT LYNDON LA ROUCHE, Lyndon La Rouche and Leroy B. Jones, Petitioners,

v.

FEDERAL ELECTION COMMISSION, Respondent.

No. 77–1184.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 27, 1978.

Decided Aug. 23, 1979.

Certiorari Denied Feb. 19, 1980. See 100 S.Ct. 1019.

Robert Case Liotta, Washington, D. C., with whom Joel D. Joseph, Washington, D. C., was on the brief, for appellants.

Charles N. Steele, Associate Gen. Counsel, and Barbara Van Gelder, Atty., Federal Election Commission, Washington, D. C., with whom William C. Oldaker, Gen. Counsel, Lester N. Scall, Asst. Gen. Counsel, Federal Election Commission, Washington, D. C., were on the brief, for appellee.

Before McGOWAN and TAMM, Circuit Judges, and JUNE L. GREEN,* District Judge.

Opinion for the court filed by Circuit Judge McGOWAN.

* Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

1. This petition for review was consolidated for purposes of oral argument with *Jones v. Federal Election Commission*, 198 U.S.App.D.C. —, 613 F.2d 864, and *Federal Election Commission v. Committee to Elect Lyndon La Rouche et al.*, 198 U.S.App.D.C. —, 613 F.2d 849, decided this date.

References herein to the petitioners' appendix and supplemental appendix in the instant case are designated as "P.A." and "S.A." respectively. In addition, references herein to the appendix in No. 77–2093 are designated as "A."

McGOWAN, Circuit Judge:

This is a petition for review of a decision of the Federal Election Commission (Commission) withholding from Lyndon La Rouche, a 1976 candidate for the Presidential nomination of the United States Labor Party (USLP), certification to receive primary matching funds under the Presidential Primary Matching Payment Account Act, 26 U.S.C. §§ 9031–9042 (1976).[1] The Commission refused to certify La Rouche on the ground that he had not established his eligibility under the fundraising threshold of the Act. Petitioners, La Rouche and the Committee to Elect Lyndon La Rouche (CTEL),[2] now raise both statutory and constitutional objections to the legal standards and certification procedures invoked by the Commission in making that determination. For reasons stated below, we affirm the decision under review.

I

The Presidential Primary Matching Payment Account Act (Act), enacted in 1974, provides for limited public funding of Presidential primary elections by authorizing federal matching payments for certain small contributions to eligible candidates. The eligibility requirements are twofold.[3] First, a candidate must agree, in writing, (1) to provide to the Commission any evidence it requests regarding qualified campaign expenses, (2) to maintain and furnish to the Commission any records or other information it requests, and (3) to submit to

2. The Committee to Elect Lyndon La Rouche (CTEL) was the principal campaign committee organized to obtain contributions for La Rouche and to manage his campaign. Throughout this opinion, we refer to La Rouche and CTEL interchangeably except where indicated otherwise.

3. The Commission's regulations, which were only proposed at the time La Rouche applied for matching funds, outline the eligibility requirements in detail. *See* 11 C.F.R. §§ 130.1–134.3 (1977). During the 1976 election, the Commission relied on its "interim guidelines" in determining whether to certify candidates to receive primary matching funds. *See* 40 Fed. Reg. 33817, 41933 (1975).

an audit by the Commission under section 9038 of the Act and to repay any amounts required under that section. *Id.* § 9033(a). Second, a candidate must "certify" to the Commission that

> (1) the candidate and his authorized committees will not incur qualified campaign expenses in excess of the limitations on such expenses under section 9035,
>
> (2) the candidate is seeking nomination by a political party for election to the office of President of the United States,
>
> (3) *the candidate has received matching contributions which in the aggregate, exceed $5,000 in contributions from residents of each of at least 20 States, and*
>
> (4) *the aggregate of contributions certified with respect to any person under paragraph (3) does not exceed $250.*

*Id.* § 9033(b) (emphasis added). The Act defines the term "contribution," for purposes of the fundraising threshold of section 9033(b) (3)–(4), as "a gift of money made by a written instrument which identifies the person making the contribution by full name and mailing address."[4] *Id.* § 9034(a).

The Commission, no later than ten days after a candidate "establishes his eligibility" under the aforementioned criteria, is required to certify to the Secretary of the Treasury for payment to the candidate the full amount to which he is entitled. *Id.* § 9036(a). That amount is equal to the first $250 or less in total contributions received from each contributor on or after the beginning of the calendar year immediately preceding the calendar year of the Presidential election for which the candidate is seeking nomination. *Id.* § 9034(a). No candidate, however, may receive matching funds in excess of one half of the total expenditure ceiling to which he has assented as a condition for establishing his eligibility. *Id.* §§ 9033 (b)(1), 9035(a). The Secretary, upon receipt of the Commission's certification for payment but not before the beginning of the calendar year in which the general election for the office of President will be held, is required to transfer promptly the certified amount from an account, known as the Presidential Primary Matching Payment Account,[5] to the candidate. *Id.* § 9037(b).

After a party selects its Presidential nominee, the Commission is required to conduct a thorough examination and audit of the qualified campaign expenses of any candidate who received matching funds in pursuit of the nomination. *Id.* § 9038(a). Matching funds that the Commission determines either (1) were received in excess of the amount to which a candidate was entitled or (2) were used for other than authorized purposes, must be repaid to the Secretary. *Id.* § 9038(b). Stiff criminal penalties also are provided for excess campaign expenses, the unlawful use of payments, false statements, and kickbacks and illegal payments. *Id.* § 9042.

## II

The events culminating in this petition for review began on October 14, 1976, when

---

**4.** The term "contribution," as defined for these purposes, does *not* include "a subscription, loan, advance, or deposit of money, or anything of value or anything described in subparagraph (B), (C), or (D) of section 9032(4)." 26 U.S.C. § 9034(a) (1976). Those subparagraphs of section 9032(4) refer to

> (B) . . . a contract, promise, or agreement, whether or not legally enforceable, to make a contribution for any such purpose,
>
> (C) . . . funds received by a political committee which are transferred to that committee from another committee, and
>
> (D) . . . the payment by any person other than a candidate, or his authorized committee, of compensation for the personal services of another person which are rendered to the candidate or committee without charge . . . . .

*Id.* § 9032(4)(B), (C), (D). *See also* 11 C.F.R. § 130.8–.9 (1977).

**5.** 26 U.S.C. § 9037(a) (1976). The Presidential Primary Matching Payment Account is one account in the Presidential Election Campaign Fund (Fund). *Id.* § 9006. The Fund is financed from the general fund of the Treasury in the aggregate amount that individual taxpayers, who may authorize payment to the Fund of one dollar on an individual return and two dollars on a joint return, have designated for such purposes on their tax returns. *Id.* §§ 6096, 9006(a). Other accounts are earmarked for financing party nominating conventions, *id.* § 9008, and general election campaigns, *id.* § 9006(b).

La Rouche wrote the Commission requesting primary matching funds for his campaign for the USLP Presidential nomination. In his letter, La Rouche proffered the requisite agreements to establish his eligibility under section 9033 (a) and "certified" that he also met the eligibility requirements of section 9033(b). This "certification" took the form of a one-page notarized statement that he met the eligibility criteria outlined in section 9033(b).[6]

The Commission staff raised two sets of questions concerning La Rouche's eligibility for matching funds. First, on October 21, 1976, the General Counsel of the Commission (General Counsel) requested La Rouche to submit additional information regarding, *inter alia*, the nominating procedures of the USLP and the states in which La Rouche was listed on the ballot as that party's Presidential candidate. This information, the General Counsel explained, was needed to ensure that La Rouche had in fact taken part in a "primary election" within the meaning of the Act, and, if so, to determine the appropriate cut-off date for counting contributions towards establishing his eligibility.

Second, the Commission staff requested further financial information to ensure that La Rouche had met the eligibility requirement of raising at least $5,000 in contributions of $250 or less in each of at least 20 states. On October 14, 1976, when La Rouche applied for matching funds, CTEL had not as yet filed its disclosure report, due October 10, for financial activity in the third quarter of the year. Prior reports, which, contrary to the requirements of 2 U.S.C. § 434(b)(2), had failed to name and provide other identifying information about contributors of more than $100, revealed that CTEL had raised far less in the period after January 1, 1975, than the minimum

threshold amount of $100,000. P.A. 15. Moreover, the third-quarter report, received on October 26, indicated that, between January 1, 1976, and September 30, 1976, CTEL had raised only $71,463.27 in total receipts. S.A. 9. The Commission staff, by telephone, asked counsel for La Rouche about the apparent shortfall and the lack of names and other identifying information for contributors of more than $100.

La Rouche's counsel submitted information in response to both sets of questions raised by the Commission staff. In connection with the USLP nominating procedures, he filed, on October 22, 1976, information revealing that La Rouche had been nominated as the Presidential candidate of the USLP at its national nominating convention on October 16, 1976. The information further indicated that the USLP national convention, at which La Rouche received the unanimous vote of the delegates from 30 states and the District of Columbia, was the culmination of a lengthy campaign during which La Rouche had sought and obtained the endorsement of the USLP Caucus in each of the 31 jurisdictions. With regard to the fundraising threshold, La Rouche's counsel, at a meeting with Commission staff members on October 27, 1976, submitted a computer printout that, in addition to providing the requisite information about contributors of over $100, indicated that, between October 1, 1975, and October 16, 1976, CTEL had received over $5,000 in contributions in each of at least 20 states. P.A. 15; S.A. 4.

During the course of the October 27 meeting, the Commission staff indicated that the Commission was likely to consider these matters at its meeting scheduled for November 4, 1976, and, assuming that it decided to go forward with a field audit of the threshold submission, that audit would

---

**6.** The letter from La Rouche provided in relevant part:

In compliance with Section 9033(b) of the Federal Election Campaign Laws, I hereby certify that:

.    .    .    .    .

3. I have received matching contributions which in the aggregate exceed $5,000 in con-

tributions from residents of each of at least 20 states; and

4. The aggregate of contributions certified with respect to any person under paragraph (3) does not exceed $250.

P.A. 1.

begin during the week following its meeting. P.A. 13–14. Rather than awaiting the Commission's decision, however, CTEL, on October 28, 1976, filed suit in the District Court for the District of Columbia alleging that the Commission could not lawfully withhold matching funds pending verification of the fact that La Rouche had met the fundraising minimum. *Committee to Elect Lyndon La Rouche v. Federal Election Commission,* C.A.No. 76–2010 (D.D.C.1976). The District Court, on October 29, denied injunctive relief, and this court, on November 1, refused to grant a stay pending appeal. In December, the case was dismissed with the approval of the District Court.

Meanwhile, on November 2, 1976, the Commission staff, after reviewing La Rouche's application and supplemental submissions, reported its recommendations to the Commission. With regard to the USLP nominating procedures, the staff expressed the view that "assuming the caucus process . . . is verifiable, Mr. La Rouche, through October 16, was a candidate for nomination of a political party, and therefore meets the requirements of [section] 9033(b)(2)." P.A. 15. With regard to the fundraising threshold, the staff noted that no other application for matching funds during the 1976 election had raised the question of whether a candidate had met the threshold amount. Staff urged the Commission to authorize a field audit of the contributions to La Rouche's primary campaign, to focus in part on whether certain contributions deposited after La Rouche was nominated on October 16, 1976, but reportedly received before that date, were in fact received before the nomination. This recommended focus reflected the General Counsel's position that, under the Act, only those contributions received before a candidate is nominated may be counted for the purposes of establishing the candidate's eligibility for primary matching funds.

On November 4, 1976, the Commission authorized the staff to conduct a field audit in order to verify La Rouche's eligibility for matching funds. S.A. 5. That audit, which took place shortly thereafter at CTEL's headquarters in New York City, revealed that CTEL had in its possession written instruments evidencing campaign contributions in excess of the threshold amount in 18 states and that, with the submission as promised of certain additional documentation, it would soon cross the threshold in two more states, Connecticut and Indiana. But, in addition to this soon to be corrected shortfall, the audit uncovered many instances where contributions made by money order or cashier's checks raised substantial questions as to whether the contributions were in fact made by residents of the states indicated.[7] The audit also revealed a pattern of heavy last-minute contributions from persons listing their occupation as that of "volunteer coordinator" for the National

---

7. For example, the documentation of the contributions to La Rouche's campaign revealed that many of the money orders and cashier's checks were given in patterns that raised substantial statutory questions. Examples are set forth below:

(1) The following money orders were all drawn from the Bowery Savings Bank in New York City:

| Serial numbers | Date | State Submitted |
|---|---|---|
| 4–114337 | 10/15/76 | Massachusetts |
| 4–114338 | 10/15/76 | Colorado |
| 4–114339 | 10/15/76 | Massachusetts |
| 4–114341 | 10/15/76 | North Carolina |
| 4–114342 | 10/14/76 | Delaware |
| 4–114343 | 10/15/76 | Massachusetts |
| 8–obliterated | 10/08/76 | Connecticut |

| Serial numbers | Date | State Submitted |
|---|---|---|
| 8–060756 | 10/12/76 | Colorado |
| 8–063400 (or 409) | 10/13/76 | Indiana |
| 8–063407 | 10/13/76 | Massachusetts |
| 8–063408 | 8/01/76 | North Carolina |
| 8–06341(?) | 10/08/76 | Colorado |

(2) The following cashier's checks were all drawn from the Pacific National Bank of Washington:

| | | |
|---|---|---|
| 2255209 | 9/28/76 | Washington |
| 2255210 | 9/28/76 | Washington |
| 2255217 | 9/29/76 | Oregon |
| 2255218 | 9/29/76 | Oregon |
| 2255219 | 9/29/76 | Oregon |
| 2255220 | 9/29/76 | Oregon |
| 2652293 | 10/05/76 | Washington |
| 2652294 | ? | Oregon |

Caucus of Labor Committees (NCLC),[8] an organization that, during the last two weeks of the eligibility period, received payments from CTEL of more than $310,000, which accounted for 55% of CTEL's expenditures during the period. It further indicated that CTEL shared office space and common personnel with NCLC and three other organizations (New Solidarity International Press Service, Inc., Campaigner Publications, Inc., and the United States Labor Party) and that those organizations accounted for 78% of CTEL's expenditures and 97% of its debt. These findings seemed particularly significant in light of the fact that CTEL had surpassed the $5,000 threshold by only a narrow margin in at least several states.

On December 27, 1976, the Commission staff submitted to the Commission two recommendations based on the field audit of CTEL's records. The first recommendation, which the Commission adopted on December 29, 1976, was to expand the field audit to include an examination of the records of the four organizations related to CTEL. The second recommendation, which was adopted on January 14, 1977, was to conduct a "confirmation of contributions with contributors . . . before any initial payments are made." P.A. 18, 24, 25.

The direct verification of CTEL contributions took place during the week of January 26, 1977, when, after notifying CTEL, the Commission staff embarked on field interviews of individuals listed as CTEL contributors in three states, Delaware, Massachusetts, and Wisconsin. In the vast majority of cases, the staff was unable to locate the contributors in question, either because of insufficient time or because the contributors were not home or did not live at the

address indicated. But, on the basis of those cases where the contributors were interviewed, the staff obtained information indicating that La Rouche had not in fact met the threshold requirement in either Delaware or Wisconsin.[9]

On February 2, 1977, CTEL submitted the documentation of contributions from Connecticut that, at least according to the results of the initial audit, would have established that La Rouche had crossed the fundraising threshold in the last of 20 states. That documentation, it was asserted, established La Rouche's eligibility under section 9033(b)(3)–(4) for matching funds and triggered the Commission's obligation under section 9036(a) to certify La Rouche's eligibility for payment to the Secretary of the Treasury within ten days. Legal action was threatened if the Commission did not certify La Rouche before February 14, 1977.

On February 10, 1977, the Commission, relying on the results of the field interviews, concluded that La Rouche had not met the threshold requirement of raising at least $5,000 in contributions of $250 or less in each of 20 states. By so doing, the Commission rendered La Rouche ineligible to receive primary matching funds.[10] This petition for review of the Commission's decision was filed pursuant to 26 U.S.C. § 9041 on February 14, 1977.

### III

This petition for review challenges on both statutory and constitutional grounds the Commission's refusal to certify La Rouche's eligibility to receive primary matching funds. Petitioners' principal claim is that the Commission, by overstating both the burden that a candidate must shoulder to establish his eligibility under

---

8. The audit indicated that NCLC volunteer co-ordinators, who contributed 16% of the total contributions received, accounted for as much as 83.2% of the contributions during October.

9. The results of the field interviews indicated a shortfall of at least $383.25 in Delaware and $317.38 in Wisconsin. *See* page —— of 198 U.S.App.D.C., page 848 of 613 F.2d *infra*.

10. Neither the parties, nor do we, address the question of whether La Rouche, through October 16, 1976, was "seeking nomination by a political party" for President, as required by section 9033(b)(2). Although the Commission suggests in its brief that it determined that La Rouche had complied with section 9033(b)(2), Resp. Brief at 11 n. 5, we find no evidence in the record indicating that the Commission itself, as opposed to its staff, made such a determination.

the fundraising threshold of the Act and the role that the Commission is authorized to play in certifying a candidate's eligibility, violated the Act when it rejected La Rouche's application for matching funds. Petitioners also object on a variety of grounds to the investigative procedures invoked by the Commission in determining that La Rouche had not demonstrated his compliance with the fundraising threshold.

We examine these interrelated claims in the context, first, of determining what obligations the Act, consistent with the Constitution, imposes on both a candidate and the Commission during the process of certifying a candidate's compliance with the fundraising threshold of the Act, and, second, of assessing whether, in the instant case, the Commission properly determined that La Rouche had not established his eligibility under the fundraising threshold.

### A

Two statutory provisions lie at the heart of the controversy over the respective roles of a candidate and the Commission during the certification process. The first provision, section 9033(b), provides that a candidate, as a condition precedent to qualifying for matching funds, "shall *certify* to the Commission that . . . (3) [he] has received matching contributions which in the aggregate, exceed $5,000 in contributions from residents of each of at least 20 States, and (4) the aggregate of contributions certified with respect to any person under paragraph (3) does not exceed $250" (emphasis added). The second provision, section 9036(a), requires that "[n]ot later than 10 days after a candidate *establishes his eligibility* under section 9033 . . ., the Commission shall certify to the Secretary for payment to such candidate . . . payment in full of amounts to which such candidate is entitled" (emphasis added).

The Act, however, defines neither the term "certify" in section 9033(b) nor the phrase "establishes his eligibility" in section 9036(a). In the absence of such definitions, the parties urge upon this court markedly different views of both what a candidate

must do to establish his compliance with the fundraising threshold and what role the Commission is authorized to play during the certification process.

Petitioners argue that a candidate seeking to establish his eligibility under section 9033(b) need only "attest authoritatively" in good faith and with knowledge that he has met the fundraising threshold. The Commission's role under section 9036(a), according to petitioners, is limited to ensuring that the candidate has so attested. This construction of the Act, we are told, finds support in (1) common usage of the term "certify," (2) the intent of Congress revealed in section 9036(a) to provide prompt payments to eligible candidates, and (3) the fact that the Act contains other mechanisms, including criminal sanctions and civil repayment provisions, adequate to ensure compliance with the eligibility requirements. Moreover, petitioners argue that if the Act were interpreted as providing for a lengthy and detailed certification process, it would be unconstitutional as regards La Rouche.

The Commission asserts that the candidate's burden in establishing his eligibility under the fundraising threshold of the Act is discharged not by attesting that he has raised the threshold amount, but rather by demonstrating to the Commission's satisfaction that he has adequate documentation to establish that the threshold amount has been raised. We are also urged to conclude that the Commission, in determining whether a candidate has discharged this burden, is empowered not only to review the documentation of campaign contributions submitted by the candidate in support of his application for matching funds, but also to audit the records of his campaign contributions, and, if necessary, to verify reported contributions by means of interviewing individual contributors. This view of the certification process, the Commission argues, is supported by (1) the plain language of section 9036(a) requiring a candidate to "establish[ ] his eligibility" for matching funds, (2) the policy underlying section 9033(b) of withholding matching funds from frivolous

candidates, and (3) the broad investigative powers vested in the Commission under the Act, 26 U.S.C. § 9039(b) (1976).

The starting point in our inquiry into the respective statutory obligations of a candidate and the Commission during the certification process is, of course, the language of the Act itself. *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 197, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). In this regard, we note that, on the one hand, section 9033(b) requires a candidate to "certify" his compliance with the fundraising threshold and, on the other, section 9036(a) requires the Commission, "[n]ot later than 10 days after a candidate establishes his eligibility under section 9033," to approve the candidate's application for matching funds. Thus, if we were to give the word "certify" its ordinary meaning, which is "to attest authoritatively [in writing]," [11] the Act would require the Commission, once a candidate had so attested, to approve his application within 10 days. The Commission, under this reading of the Act, would perform the quite limited task of rubberstamping notarized statements of eligibility.

Such a certification process, we have no doubt, is not what Congress intended when it enacted the provisions at issue. Even petitioners recognize this point, conceding that not "anyone who signed . . . a statement [of eligibility] would immediately become eligible for funds; clearly an element of knowledge and good faith is involved." Pet. Br. 7. It is obvious, therefore, that we cannot interpret the statutory provisions at issue solely by reference to their wording.

In the absence of any specific directive in the legislative history, we must turn instead to the policies underlying the Act as a guide to our task of statutory interpretation. The policies relevant here are twofold. First, Congress, in enacting the fundraising threshold of section 9033(b)(3)–(4), sought to withhold public funds from frivolous candidates. In this regard, the Committee on House Administration took the position that this modest threshold requirement is the most reasonable and best practicable test to assure that public funds are provided to serious candidates. By matching only small contributions the threshold provides a means of testing public support of a candidate and encourages a candidate to involve large numbers of voters in his fundraising efforts.

H.R.Rep.No. 1239, 93d Cong., 2d Sess. 13 (1974); *accord,* S.Rep.No. 689, 93d Cong., 2d Sess. 6 (1974), U.S.Code Cong. & Admin. News 1974, pp. 5587, 5592 ("Such assistance is limited to those who demonstrate they are serious candidates by raising a threshold eligibility fund in small amounts from many contributors."). Second, Congress, by requiring the Commission under section 9036(a) to certify payments to a candidate not more than 10 days after the candidate establishes his eligibility, evidenced an intent to provide prompt payments to eligible candidates. The 10-day deadline serves to ensure that an eligible candidate will have the money he needs at a time when its availability is most important to his campaign.

The best way to accommodate these two policies is, we think, to construe the Act essentially along the lines advanced by the Commission. That is to say, we agree that the Act requires a candidate seeking to establish his eligibility under section 9033(b)(3)–(4) to demonstrate to the Commission's satisfaction that he has adequate documentation to establish that the threshold amount has been raised. But, in light of the policy favoring prompt payments to eligible candidates, we find it necessary to circumscribe to a certain extent the scope of the Commission's investigative role during the certification process.

To be specific, we construe the Act to provide for a certification mechanism that works as follows: The candidate's burden in

---

11. *Doherty v. McDowell,* 276 F. 728, 730–31 (D.Me.1921) ("certify" defined as "to attest authoritatively" and " 'any form which affirms the fact in writing is sufficient' "); *accord, Higby v. Hooper,* 124 Mont. 331, 221 P.2d 1043 (1950); *Bates v. Bates,* 247 Ala. 337, 24 So.2d 440 (1946).

establishing his eligibility under section 9033(b)(3)–(4) is to submit documentation demonstrating that he has met the fundraising threshold. The candidate may do so either by submitting to the Commission the written instruments evidencing his campaign contributions [12] or by making an equivalent showing.[13] The Commission's role under section 9036(a) is then to review the submission to determine whether it adequately documents the candidate's compliance with the fundraising threshold. That determination, with a narrow exception discussed below, is limited to deciding, on the face of the candidate's submission, (1) whether the reported contributions are in fact "contributions" within the meaning of the Act, 26 U.S.C. § 9034(a) (1976), and (2) whether the contributions that meet the statutory definition exceed the threshold amount, id. § 9033(b)(3)–(4). If this determination is adverse to a candidate, the Commission should so notify the candidate and permit him to resubmit his fundraising documentation. If the determination is favorable, and if the candidate has met the other eligibility requirements, the Commission, no later than 10 days after its final determination of eligibility, is required to certify for payment to the candidate the full amount to which he is entitled. Id. § 9036(a).

■ The limited exception under which the Commission's section 9036(a) determination is not restricted to the face of the candidate's submission is where that submission (or that submission together with other reports on file with the Commission) contains patent irregularities suggesting the possibility of fraud.[14] In such a case, the Commission is empowered, as part of the certification process, to conduct a properly circumscribed investigation, including an audit of the candidate's records [15] and, if

---

**12.** The Act defines the term "contribution," for the purposes of the fundraising threshold of section 9033(b)(3)–(4), as "a gift of money made by a *written instrument* which identifies the person making the contribution by full name and mailing address." 26 U.S.C. § 9034(a) (1976) (emphasis added). *See* note 3 *supra.* The Commission's regulations carry forth the requirement that a "contribution" be made by written instrument. 11 C.F.R. § 130.8 (1977).

**13.** Section 131.2(c) of the Commission's regulations, which was proposed at the time La Rouche applied for matching funds but not yet final, now defines what documentation a candidate must submit to establish his eligibility under section 9033(b)(3)–(4) of the Act. This regulation, which we find consistent with the Act, provides:

For each State in which the candidate certifies he or she has met this requirement, the candidate shall—

(1) Submit an alphabetical list of contributors showing each contributor's full name and residential address, the date of the receipt of each contribution by the candidate or his or her committee and of the deposit into the designated campaign depository, the dollar amount of each contribution submitted for matching purposes, the matchable portion thereof, the total amount of all matchable contributions submitted, and a notation as to whether the contribution was received as a result of an entertainment activity under § 130.9(i); *and*

(2) Submit a photocopy of each check or other written instrument for each contribution which the candidate submits to receive matching funds. The photocopies shall be segregated alphabetically by deposit, and shall be accompanied by copies of the relevant deposit slip.

11 C.F.R. § 131.2(c)(1)–(2) (1977).

**14.** The issue before us is the extent to which section 9036(a) permits the Commission to look beyond the face of a candidate's threshold submission in determining whether the candidate has established his eligibility for matching funds. Our conclusion that the Commission may do so only where it discovers that the threshold submission (or the submission together with other reports on file with the Commission) contains patent irregularities suggesting the possibility of fraud in no way restricts the Commission's otherwise broad investigative powers outside the certification process. *See* note 17 *infra.*

**15.** Petitioners argue that the Commission is without statutory authority to conduct an audit during the certification process because the audit and repayment provisions of section 9038 contemplate an audit only *after* a candidate has received matching funds. We are urged to conclude, under the principle of *expressio unius est exclusio alterius,* that Congress, by expressly providing only for post-certification audits, intended not to authorize pre-certification audits.

The flaw in this argument is that petitioners have overlooked section 9039(b), which provides:

necessary, field interviews of the contributors to his campaign.[16] The Commission, on the basis of the candidate's submission and its own inquiry, must then determine whether the candidate in fact has established his compliance with the fundraising threshold. *Id.* § 9036(a).

This interpretation of the Act serves the policies underlying both statutory provisions at issue. The policy underlying section 9033(b)(3)–(4), which is to withhold funds from frivolous candidates, is served by requiring a candidate either to submit to the Commission the written instruments evidencing campaign contributions or to make an equivalent showing. This requirement will provide the Commission with a ready means of detecting, and denying certification to, a candidate who has not raised the threshold amount. If the threshold submission does not adequately document the candidate's compliance with the fundraising threshold, the Commission is empowered, indeed required, to withhold certification

until the candidate submits appropriate documentation. If the threshold submission contains patent irregularities suggesting the possibility of fraud, the Commission is authorized to conduct an investigation during the certification process to determine whether the candidate in fact has raised the threshold amount.[17]

The policy underlying section 9036(a), which is to provide prompt payments to eligible candidates, is served by limiting the role of the Commission during the certification process to reviewing the face of a candidate's threshold submission except where that submission (or that submission together with other reports on file with the Commission) contains patent irregularities suggesting the possibility of fraud. We so limit the Commission's investigative role because long delays are sure to ensue in cases where the Commission looks beyond the face of a candidate's threshold submission during the certification process.[18] In the

The Commission is authorized to prescribe rules and regulations in accordance with the provisions of subsection (c), *to conduct examinations and audits (in addition to the examinations and audits required by section 9038(a))*, to conduct investigations, and to require the keeping and submission of any books, records, and information, which it determines to be necessary to carry out its responsibilities under this chapter. ·

(Emphasis added). It would be inappropriate, in our view, to draw the inference suggested by petitioners because section 9038 is not the exclusive repository of the Commission's auditing authority.

16. The Commission's statutory authority to conduct field interviews during the certification process is encompassed in its broad investigative mandate "to conduct examinations and audits (in addition to the examinations and audits required by section 9038(a)) [and] to conduct investigations . . . which it determines to be necessary to carry out its responsibilities under [the Act]." 26 U.S.C. § 9039(b) (1976). This conclusion finds support in the fact that Congress has indicated elsewhere in the Federal Election Campaign Act, *see* 2 U.S.C. § 438(a)(8) (1976), that the Commission's investigative authority to conduct post-nomination "examination[s] and audit[s]" under section 9038 includes the power to verify contributions by means of field interviews. Inasmuch as the plain language of section 9039(b) confers upon the Commission even broader investigative authority than that of

section 9038, we think it follows that Congress must have intended to vest the Commission with the authority to conduct field interviews under section 9039(b) as well.

17. Nor is the Commission powerless to protect the fisc in the unlikely event that a fraudulent submission is not evident on its face. Nothing in this opinion restricts the Commission's authority to conduct investigations under section 9039(b) outside the certification process, *see* note 14 *supra*, its authority under section 9038 to conduct post-nomination audits and to seek recoupment of overpayments, or its general investigative and enforcement authority under the Federal Election Campaign Act, *see, e. g.,* 2 U.S.C. §§ 437d, 437g (1976).

18. By contrast, the Commission has imposed on itself a five-day deadline for making a preliminary determination of a candidate's eligibility ·on the basis of his threshold submission. The Commission's regulations provide: ·

During the matching payment period, the Commission shall, as soon as practicable and generally *within 5 working days*, examine the submission under § 131.1 and § 131.2(a), (b), and (c) and shall either—

(a) Make a preliminary determination that the candidate has satisfied the requirement of raising an amount in excess of $5000 in contributions from individuals who are residents of each of at least 20 States, which in respect to any individual do not exceed $250; or

instant case, for example, the Commission took more than three months after it authorized the initial audit of CTEL's records to reach a final decision on La Rouche's eligibility. Accordingly, we construe section 9036(a) to permit the Commission, as part of the certification process, to conduct an investigation beyond the face of a candidate's threshold submission only in cases where patent irregularities appear on the face of that submission. Such cases are unlikely to involve candidates who are in fact eligible for matching funds.

The certification mechanism outlined above is far better tailored to the policies underlying the Act than that advocated by petitioners. To adopt petitioners' view that the Commission must certify any candidate who, acting knowingly and in good faith, "attests authoritatively" that he has met the fundraising threshold would be, we think, to restrict unduly the Commission's ability to detect frivolous candidates by shielding it from the documentation of the candidate's contributions.[19] Nor would petitioner's interpretation of the certification process necessarily serve the policy of providing prompt payments to eligible candidates. It is our view that the inexact standard of whether a candidate acted "knowingly and in good faith" might well result in lengthy investigations into what a candidate knew, or should have known, about his campaign contributions at the time he applied for matching funds.

An additional advantage of the certification process outlined above over that advanced by petitioners is that the former, unlike the latter, involves objective standards. The Commission, under our interpretation of section 9036(a), must determine as an initial matter (1) whether a candidate's threshold submission adequately documents his compliance with the fundraising threshold and (2) whether that submission contains patent irregularities suggesting the possibility of fraud. Both inquiries involve essentially objective determinations regarding the adequacy of the threshold submission. The inquiry under petitioner's view of the certification process would include the more subjective question of whether the candidate acted in "good faith" when he certified his compliance with the fundraising threshold.

The advantage of an objective standard stems from the fact that, as petitioners themselves emphasize, the certification decision has an important impact on the exercise of first amendment rights, inasmuch as campaign funds "are often essential if 'advocacy' [of beliefs and ideas] is to be truly or optimally 'effective.' " *Buckley v. Valeo,* 424 U.S. 1, 65–66, 96 S.Ct. 612, 657, 46 L.Ed.2d 659 (1976). It also stems from the fact that the issue of whether a candidate has met the fundraising threshold often will arise in cases where a candidate either lacks national prominence or belongs to a minor party outside the mainstream of American politics. Given our national commitment to open and robust discussion of all political viewpoints, *see, e. g., New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), we regard it as particularly important to ensure that the Commission is applying the eligibility criteria for primary matching funds in an even-handed manner. Accordingly, we are reluctant to endorse a subjective standard such as "good faith" belief, preferring instead objective standards that circumscribe the Commission's discretion and permit more meaningful judicial review.

For essentially the same reasons that we believe that objective standards should govern the certification decision, petitioners ar-

---

(b) Promptly notify the candidate giving a detailed explanation of the reasons for the Commission's conclusion that the candidate has failed to satisfy the matching payment threshold requirements.

11 C.F.R. § 131.3 (1977) (emphasis added).

**19.** Nor do we feel that petitioners' reading of the statute is compelled by the fact that the Act contains other mechanisms, including criminal sanctions and civil repayment provisions, also designed to ensure compliance with the eligibility requirements. Nothing in the legislative history suggests that Congress regarded those other mechanisms as sufficient to protect against frivolous candidates receiving matching funds.

gue that if the Act were interpreted as providing for a lengthy and detailed certification process, it would violate the first amendment as a prior restraint on La Rouche's right to free speech. Citing the important role that campaign funds play in the advocacy of political beliefs, petitioners assert that "a procedure that would jeopardize the payment of matching funds, in the period precedent to the election when they would be crucial to the effective expression of political viewpoints, would be a serious abridgment of associational rights and free speech."

It is our view, however, that, at least as regards La Rouche, the certification process outlined above is constitutional. In upholding the constitutionality of fundraising thresholds for federal matching funds, the Supreme Court in *Buckley v. Valeo* noted:

The States have . . . been held to have important interests in limiting places on the ballot to those candidates who demonstrate substantial popular support. *E. g., Storer v. Brown, supra* [415 U.S. 724], at 736, [94 S.Ct. 1274, at 1282, 39 L.Ed.2d 714]; *Lubin v. Panish, supra* [415 U.S. 709], at 718–719 [94 S.Ct. 1315, at 1321, 39 L.Ed.2d 702]; *Jenness v. Fortson,* 403 U.S. 431, 442 [91 S.Ct. 1970, 1976, 29 L.Ed.2d 554] (1971); *Williams v. Rhodes,* 393 U.S. [23], at 31–33 [89 S.Ct. 5, at 10, 11, 21 L.Ed.2d 24]. Congress' interest in not funding hopeless candidacies with large sums of public money, S.Rep.No.93–689, *supra,* at 7, necessarily justifies the withholding of public assistance from candidates without significant public support. *Thus, Congress may legitimately require "some preliminary showing of a significant modicum of support," Jenness v. Fortson, supra* [403 U.S.], at 442 [91 S.Ct., at 1976], *as an eligibility requirement for public funds.*

424 U.S. at 96, 96 S.Ct. at 671 (emphasis added). Surely then, if Congress can require this preliminary showing of support as an eligibility requirement for matching funds, it can also impose reasonable procedures for ensuring that a candidate in fact has the requisite degree of support. The certification process outlined above is, we

think, entirely reasonable, especially insofar as it permits the Commission to look beyond the face of a candidate's threshold submission only if that submission contains patent irregularities. Certainly, on the record in this case (which we explore in detail below), La Rouche has failed to demonstrate that the Commission acted unreasonably, or even that it erred, in rejecting his application for matching funds.

In sum, we adopt the certification process outlined above, for it best serves the policies underlying the Act and turns on objective standards that circumscribe the Commission's discretion and permit more meaningful judicial review. Moreover, we see no first amendment barrier, at least as regards La Rouche, to our interpretation of the Act.

### B.

■ It remains for us to determine whether the Commission, on the facts presented here, properly determined that La Rouche was ineligible for matching funds because he had not satisfied the threshold requirement of section 9033(b)(3)–(4). Petitioners argue, on the basis of their interpretation of the Act, that La Rouche established his eligibility for matching funds either (1) on October 14, 1976, when he submitted a sworn statement that he had raised the threshold amount, (2) on October 27, 1976, when CTEL submitted a computer printout that listed contributions in excess of the threshold amount, or (3) on February 2, 1977, when CTEL submitted documentation that, at least according to the results of the initial audit, would have established that La Rouche had crossed the fundraising threshold in the last of 20 states. The Commission takes the contrary view that, under its interpretation of the Act, La Rouche failed all along to establish his eligibility for matching funds.

In light of the legal standards outlined in the preceding section, we now review the merits of the Commission's refusal to certify La Rouche's eligibility for matching funds. We are cognizant of course that the scope of our review is limited to determin-

ing whether the Commission's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1976).[20]

Turning to the facts at hand, we may quickly dispose of petitioners' argument that La Rouche established his eligibility for matching funds during October 1976. The candidate's burden in establishing his eligibility under section 9033(b)(3)–(4) is, as we outlined above, to submit documentation demonstrating that he has met the fundraising threshold. The candidate may discharge this burden either by submitting to the Commission the written instruments evidencing his campaign contributions or by making an equivalent showing. It is beyond question that, on October 14, 1976, La Rouche had not established his eligibility under section 9033(b)(3)–(4), inasmuch as he had done no more than to submit to the Commission a one-page notarized statement that he had met the fundraising threshold. Nor can we say that the Commission acted arbitrarily or capriciously in refusing to certify La Rouche on the basis of the computer printout submitted on October 27, 1976, which listed contributions in excess of the threshold amount. It is our view that the Commission properly determined that a computer printout, which simply summarizes undocumented data, is not a showing equivalent to the documentation itself. Accordingly, we find no merit to petitioners' argument that the Commission erred in not approving La Rouche's applications for matching funds in October 1976.

Nor do we find reversible error in the Commission's decision, on November 4, 1976, to authorize a staff audit of CTEL's records in New York for the purpose of verifying La Rouche's eligibility for matching funds. Section 9036(a), as construed above, permits the Commission when determining if a candidate has established his eligibility under section 9033(b)(3)–(4), to look beyond the face of the candidate's threshold submission only if that submission (or that submission together with other reports on file with the Commission) contains patent irregularities suggesting the possibility of fraud. The information on hand when the Commission authorized the audit of CTEL's records included (1) La Rouche's original application for matching funds, submitted on October 14, 1976, in which he asserted that he had met the fundraising threshold, (2) CTEL's third-quarter report, submitted on October 26, 1976, which indicated that, between January 1, 1976, and September 30, 1976, CTEL had raised $71,463 in total contributions, and (3) the computer printout, submitted on October 27, 1976, which listed contributions in excess of $5,000 in each of 20 states.

It was obvious from the face of these submissions, especially the computer printout, that if La Rouche had surpassed the fundraising threshold, he had done so only by a narrow margin. This fact surely warranted the Commission in keeping a close eye on the sufficiency of the documentation of the contributions to La Rouche's campaign, but it did not amount to a patent irregularity suggesting the possibility of fraud. Nor was it a patent irregularity that the computer printout raised the question whether certain contributions deposited after La Rouche was nominated on October 16, 1976, but reportedly received before that date, were in fact received before the nomination. Accordingly, because the information on hand revealed no patent irregularities, the Commission was not warranted in conducting an investigation beyond the face of La Rouche's threshold submission. Rather than authorizing an audit of CTEL's

---

**20.** The Act provides that judicial review of action taken by the Commission is governed by the Administrative Procedure Act, *see* 26 U.S.C. § 9041 (1976), which, in turn, provides that, where as here agency action is not subject to formal rulemaking procedures, the applicable standard of review is whether the agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *see* 5 U.S.C. § 706(2)(A) (1976). *Cf. United States v. Florida East Coast Ry. Co.*, 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973). *See* generally *Natural Resources Defense Council v. SEC*, 196 U.S.App.D.C. 126, 140–150, 606 F.2d 1031, 1047–1057 (D.C.Cir.1979); *Weyerhaeuser Co. v. Costle*, 191 U.S.App.D.C. 309, 322–26, 590 F.2d 1011, 1024–28 (D.C.Cir.1978).

records, the Commission, which of course was under no obligation to certify La Rouche's eligibility, simply should have awaited further submissions in support of his eligibility.

Even though the Commission acted *ultra vires* in authorizing the audit of CTEL's records, we regard this error as nonprejudicial. If the Commission followed the proper course of awaiting a further submission from La Rouche and if La Rouche had in fact submitted the requisite documentation under section 9033(b)(3)–(4), the documentation would have contained, as the Commission audit revealed, patent irregularities that surely would have warranted an inquiry beyond the face of the threshold submissions. Those irregularities were numerous instances of contributions by money orders and cashier's checks that raised substantial questions as to whether the contributions were made by residents of the states indicated. *See* note 7 *supra*. Therefore, because these irregularities would have been uncovered in any event if La Rouche had submitted the requisite docu-

mentation under section 9033(b)(3)–(4), we sustain the Commission's audit, even though unauthorized by statute, as nonprejudicial error.[21] *See* Administrative Procedure Act § 10(e), 5 U.S.C. § 706 (1976) ("due account shall be taken of the rule of prejudicial error").

The Commission, once confronted with these patent irregularities, was warranted, we think, in taking further investigatory action. It was neither unreasonable nor in excess of statutory authority for the Commission, in light of the questions raised by the money orders and cashier's checks about the states in which certain contributors resided, to authorize field interviews of CTEL contributors to verify their donations to La Rouche's campaign,[22] nor was it error, given the aforementioned irregularities and the pattern of last-minute contributions from volunteer coordinators of an organization closely related to CTEL, to authorize an audit of the books of that and other such organizations. Both the field interviews, which focused on contributions reported in three representative states, and the expand-

21. The appropriate remedy in a case where the Commission wrongfully seeks to conduct an audit or field interviews during the certification process is a petition for review in this court. *See* 26 U.S.C. §§ 9036(a), 9041(a) (1976). Section 9041(a) provides that:

> Any agency action by the Commission made under the provisions of this chapter shall be subject to review by the United States Court of Appeals for the District of Columbia Circuit upon petition filed in such court within 30 days after the agency action by the Commission for which review is sought.

A Commission decision to conduct an investigation during the certification process on the ground that a candidate's threshold submission contains patent irregularities is, we think, "agency action" within the meaning of section 9041(a).

22. Petitioners challenge the legality of the field interviews on the ground that they were not authorized by majority vote of the Commission as required by 2 U.S.C. § 437c(c) (1976). Section 437c(c) provides in relevant part:

> All decisions of the Commission with respect to the exercise of its duties and powers under the provisions of this subchapter shall be made by a majority vote of the members of the Commission . . . . . A member of the Commission may not delegate to any person his vote or any decision-making au-

thority or duty vested in the Commission by the provisions of this subchapter.

It is petitioners' position that the Commissioners never voted at all on this matter, but simply raised no objection to a staff memorandum recommending that the filed interviews be conducted and stating that "[i]f no objection is raised within 24 hours, the staff will proceed as outlined above." P.A. 24.

This argument, we think, falls short of the mark, for section 437c(c) requires only that a majority vote be taken, not that it be taken in any specified manner. The record reveals that the Secretary of the Commission distributed the staff memorandum to the six Commissioners on January 13, 1977, that five of the six Commissioners returned the memorandum the next day without objection, and that the sixth Commissioner who did not return the memorandum nevertheless raised no objection to the proposed action. A. 59–60. On the basis of this response, the Secretary of the Commission, on January 14, 1977, certified that the Commission had adopted the staff proposal. P.A. 25. It is our view that given the fact that five Commissioners returned the memorandum without objection, the staff recommendation was adopted by "majority vote" within the meaning of section 437c(c). Nothing in that provision forbids the Commissioners from voting, as they did here, by means of memoranda.

ed audit, which focused on the books of those organizations closely related to CTEL, were properly circumscribed in the sense that they were reasonable investigatory responses to the irregularities uncovered in the initial audit.

As a final matter, we think that the Commission acted properly when, on February 7, 1977, it formally rejected La Rouche's application for matching funds on the ground that he had not established his eligibility under section 9033(b)(3)–(4). Petitioners argue that La Rouche established his eligibility on February 2, 1977, when CTEL submitted to the Commission the documentation of contributions found lacking in the initial audit of CTEL's books. This argument falls short of the mark, however, because it misconceives the appropriate legal standard. The issue before the Commission where, as here, patent irregularities are discovered in the documentation underlying the contributions to a candidate, is not whether the candidate has documentation to establish that he has raised the threshold amount, but rather whether the candidate in fact has met the fundraising threshold.

In rejecting La Rouche's application, the Commission relied on the results of the field interviews of CTEL contributors in Delaware, Massachusetts, and Wisconsin. Those interviews indicated that, in both Delaware and Wisconsin, La Rouche had failed to raise the requisite amount. In Delaware, where the initial audit indicated that La Rouche had exceeded the $5,000 threshold by only $36.75, the field interviews revealed that $420 of that total had been contributed from funds not belonging to the listed contributors. Such funds obviously are not "contributions" within the meaning of the Act, see 26 U.S.C. § 9034(a) (1976), for to hold otherwise would render meaningless the requirement of section 9033(b)(4) that only $250 per person be counted toward the threshold amount. In Wisconsin, where the initial audit indicated that La Rouche had exceeded the fundraising threshold by only $172.62, one listed contributor denied altogether having made a $250 contribution and two others confirmed only a portion ($125) of their reported contributions ($365). Thus, inasmuch as La Rouche plainly fell short of the threshold amount in at least two of the twenty states involved,[23] we conclude that the Commission did not err in refusing to certify La Rouche's eligibility to receive matching funds on the ground that he failed to satisfy the fundraising threshold of section 9033(b)(3)–(4).[24]

23. Although we hold today in No. 77–2093 that the agents of the Commission may have exceeded their statutory authority during the field interviews in asking certain questions regarding the contributors' political beliefs and may even have violated the fourth amendment in procuring financial documents and bank records from one contributor in particular, *Jones v. Unknown Agents of the Federal Election Commission*, 198 U.S.App.D.C. —— at —— ——, 613 F.2d 864, 878–880 (D.C.Cir. 1979), we do not believe that our holding in No. 77–2093 renders suspect the reliability of the results of the field interviews. Nor in fact do petitioners directly dispute the results of the field interviews. Accordingly, in the instant case, we rely on those results in affirming the Commission's refusal to certify La Rouche's eligibility to receive matching funds.

24. Petitioners also argue that they have been denied equal protection under the fifth amendment, insofar as the Commission singled out La Rouche for different and unusual treatment in rejecting his application for primary matching funds. The short answer to this argument is that the record reveals that La Rouche's application for matching funds was the only application during the 1976 election that raised any substantial question as to whether the fundraising threshold had been met. In the absence of any evidence of a pattern of harassment or bad faith on the part of the Commission, we see no basis for finding an equal protection violation simply because the Commission accorded unique treatment to a unique application.

Nor is this "[a] statutory scheme that blocks minority party access to the electoral process [and thereby] unjustifiably invades the right to vote and to associate." *Doe v. Martin,* 404 F.Supp. 753, 759–60 (D.D.C.1975) (three-judge court) (footnote omitted). As the Supreme Court in *Buckley v. Valeo* noted:

Subtitle H [which includes the Act] does not prevent any candidate from getting on the ballot or any voter from casting a vote for the candidate of his choice; the inability, if any, of minor-party candidates to wage effective campaigns will derive not from lack of public funding but from their inability to raise private contributions. Any disadvantage suffered by operation of the eligibility formulae under Subtitle H is thus limited to

## IV

It is our view, in sum, that Congress intended to create a certification mechanism designed to ensure both that frivolous candidates are denied primary matching funds and that eligible candidates are paid such funds promptly. Our construction of section 9033(b)(3)–(4) and section 9036(a) reflects these two policies. The first policy is served by our holding that a candidate seeking to establish his eligibility under section 9033(b)(3)–(4) must satisfy the Commission that he has the requisite documentation to establish his compliance with the fundraising threshold. The second policy is served by our holding that the Commission, in passing on the eligibility of a candidate, must restrict its inquiry under section 9036(a) to the face of the candidate's threshold submission except where that submission (or that submission together with other documents on file with the Commission) contains patent irregularities suggesting the possibility of fraud.

There is no question but that, under the legal standards outlined above, the Commission, in October 1976, acted properly in not approving La Rouche's application for matching funds, inasmuch as his threshold submissions fell far short of the documentation required to establish his eligibility. The proper course of action at this juncture would have been to await the submission of additional documentation. Instead, the Commission, absent the requisite finding of patent irregularities on the face of the initial submissions, chose to conduct an audit of CTEL's books. This error, we think, was nonprejudicial, however, because if the Commission had awaited the requisite documentation, it would have contained, as the audit revealed, patent irregularities of the

sort that surely would have warranted an audit of CTEL's books. It is our view that the Commission, once confronted with these irregularities, acted both reasonably and within the scope of its statutory authority in conducting a further investigation and finally in rejecting, on the basis of that investigation, La Rouche's application for matching funds. Accordingly, we affirm the decision under review.

*It is so ordered.*

the claimed denial of the enhancement of opportunity to communicate with the electorate that the formulae afford eligible candidates. But eligible candidates suffer a countervailing denial. As we more fully develop later, acceptance of public financing entails voluntary acceptance of an expenditure ceiling. Noneligible candidates are not subject to that limitation. Accordingly, we conclude that public financing is generally less restrictive of access to the electoral process than

the ballot-access regulations dealt with in prior cases. In any event, Congress enacted Subtitle H in furtherance of sufficiently important governmental interests and has not unfairly or unnecessarily burdened the political opportunity of any party or candidate. 424 U.S. at 94–96, 96 S.Ct. at 670–71 (footnotes omitted). For the same reasons, we find no constitutional infirmity in the certification procedure outlined above at least as regards La Rouche.