**IRAN AIR, Petitioner,**

**v.**

**Robert F. KUGELMAN, Acting Under Secretary for Bureau of Export Administration, U.S. Department of Commerce, Respondent.**

**Nos. 91–1596, 92–1304 and 92–1389.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 20, 1993.

Decided July 2, 1993.

Thomas J. Whalen,. argued for petitioner. Kevin Michael Sherlock also entered an appearance for petitioner.

John S. Koppel, Atty., Dept. of Justice, argued for respondent. With him on the brief were Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty. at the time the brief was filed, Douglas N. Letter, Atty., Dept. of Justice, and Thomas C. Barbour, Sr. Trial Atty., Dept. of Commerce. Michael Jay Singer, Atty., Dept. of Justice, also entered an appearance for respondent.

Before EDWARDS, RUTH BADER GINSBURG, and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge RUTH BADER GINSBURG.

Concurring opinion filed by Circuit Judge SILBERMAN.

GINSBURG, RUTH BADER, Circuit Judge.

## I. INTRODUCTION

In 1985, Iran Air unwittingly violated the Export Administration Act of 1979, 50 U.S.C.App. §§ 2401–2420, in connection with the shipment of three U.S.-made "signal generators"[1] from Germany to Iran. In 1990, the Commerce Department's Office of Export Enforcement sought to impose civil sanctions against Iran Air, but the Administrative Law Judge (ALJ) assigned to hear the case ruled that the Export Act authorized sanctions only for knowing violations. Because the Office of Export Enforcement had neither alleged nor proved that Iran Air knowingly violated the law, the ALJ dismissed the charge. On final agency review, the Acting Under Secretary of Commerce for Export Administration emphasized that the ALJ's interpretation of the Act clashed with the Department's firm position that "knowledge" is not a requirement in a civil penalty case. The Under Secretary imposed a $100,-000 civil penalty (the statutory maximum) and a suspension of export privileges for twenty-four months, twenty-one of them to be waived if Iran Air paid the penalty in full within thirty days of the Under Secretary's order.

On petition for review to this court, Iran Air asserts that, as the ALJ ruled, only knowing violations of export administration regulations are sanctionable. In any event, Iran Air insists, this court's decision in *Dart v. United States*, 848 F.2d 217 (D.C.Cir.1988), precludes a ruling by the Under Secretary overturning that of the ALJ. We hold that both sides have misperceived our ruling in *Dart*. That decision does not permit the agency head to reject the ALJ's fact findings, but neither does it allow the ALJ to supplant the head of the agency in construing the applicable law and regulations. Accordingly, we affirm the Under Secretary's construction of the governing statute and regulation; we remand, however, for a reasoned determination of the appropriate penalty.

## II. BACKGROUND

In August 1985, Iran Air placed an order for three top-of-the-line signal generators with a German-based company, Fluke Germany, for export to Iran. The purchase order stated: "Please ship to Iran Air Frankfurt Airport for reforwarding to Tehran Iran." Fluke Germany did not have the generators in stock, and therefore referred the order to its affiliate, Fluke Holland. Fluke Holland, which was also out of the signal generators, obtained them from the United States manufacturer, Fluke USA. The invoices associated with the transactions between Fluke USA and Fluke Holland and between Fluke Holland and Fluke Germany bore the destination control statement: "These commodities were licensed for ultimate destination Fed.Rep. Germany. Diversion contrary to United States law is prohibited."

On October 17, 1985, Fluke Germany delivered the Fluke USA generators to Iran Air

---

1. Signal generators are high-technology devices used, *inter alia*, for testing airplane communications equipment.

in Frankfurt, Germany. In contrast to the previous invoices, the invoice for this transaction contained no destination control statement. A few days later, Iran Air shipped the generators to Iran.

Regulations pursuant to the Export Administration Act of 1979 (Export Act), 50 U.S.C.App. §§ 2401–2420, instruct that "reexport" of certain U.S.-made equipment, such as the signal generators in this case, from Germany to Iran requires a Commerce Department license:

> Unless the reexport of a commodity previously exported from the United States has been specifically authorized in writing by the Office of Export Licensing prior to its reexport ..., no person in a foreign country (including Canada) or in the United States may:
>
> (a) Reexport such commodity ... from the authorized country(ies) of ultimate destination; or
>
> (b) Export such commodity from the United States with the knowledge that it is to be reexported ... from the authorized country(ies) of ultimate destination.

15 C.F.R. § 774.1 (footnote omitted). Despite this regulation, Iran Air did not obtain a reexport license for the transfer of the U.S.-made signal generators from Germany to Iran. Nor does it appear that any Fluke company did so.

Five years later, in October 1990, the Commerce Department's Office of Export Enforcement (OEE) instituted administrative proceedings against Iran Air—though apparently not against any of the Fluke companies [2]—for the imposition of civil sanctions. OEE charged Iran Air, pursuant to 15 C.F.R. § 787.2,[3] with causing the reexport of "U.S.-origin Fluke signal generators ... from ... Germany to Iran without obtaining

... the reexport authorization required by [15 C.F.R. § ] 774.1."

After an evidentiary hearing, the ALJ dismissed the charge. The ALJ ruled, centrally, that the governing statutory prescription, 50 U.S.C.App. § 2410(c), authorized the imposition of civil sanctions only for knowing violations of the Export Act or regulations thereunder. The OEE, according to the ALJ, neither alleged nor proved that Iran Air had knowingly violated the law.[4]

The Acting Under Secretary of Commerce for Export Administration (Under Secretary) disagreed with the ALJ's reading of the Export Act. In accord with OEE's position, the Under Secretary ruled that the exporter's knowledge need not be shown as a prerequisite to the imposition of civil penalties. Declaring that the ALJ had incorrectly construed the civil sanction prescriptions to include a state of mind requirement, the Under Secretary remanded the case for reconsideration consistent with the agency's view of the controlling law.

On remand, the ALJ refused to follow the Under Secretary's reading of the law and, again, dismissed the charge. The ALJ emphasized that the Export Act allowed the Under Secretary only to "affirm, modify, or vacate" an ALJ decision, 50 U.S.C.App. § 2412(c)(1); that language, as construed in *Dart v. United States*, 848 F.2d 217 (D.C.Cir. 1988), the ALJ said, precluded reversal of his determination "summarily," i.e., without "meaningful explanation." Even under the agency's construction of the law, the ALJ concluded, the errors in ordering and shipping the Fluke USA-made generators "would have warranted no more than a warning" to the American manufacturer, its subsidiaries, and Iran Air.

---

**2.** At oral argument, the court asked counsel for the agency: "Was there any proceeding against Fluke for violation of the Export Act?" "Not that I am aware of," counsel responded, "and I don't believe the record reflects this."

**3.** Section 787.2, titled "Causing, aiding, and abetting a violation," reads:

> No person may cause, or aid, abet, counsel, command, induce, procure, or permit the doing of any act prohibited, or the omission of any act required, by the Export Administration

Act or any regulation, order, or license issued under the Act.

**4.** The ALJ did not specify whether he found Iran Air unaware that the signal generators originated from the United States or whether he rested his decision on Iran Air's lack of knowledge that a license was needed for reexport of the generators from Germany to Iran; lower model Fluke signal generators, it appears, could be shipped without such a license.

Once more the Under Secretary asserted the agency head's prerogative to interpret the governing law: "'Knowledge,'" the Under Secretary repeated, "is not an essential element of proof for the imposition of civil penalties...." (Emphasis in original.) That construction of the Export Act and the regulations thereunder, the Under Secretary said, "became the law of this case," i.e., law "binding on the ALJ and the parties." For a second time, the Under Secretary vacated the ALJ's decision and remanded for a determination of the charge against Iran Air consistent with the rule that Export Act civil penalties entail no *scienter* requirement.

Unmoved, the ALJ said in a terse order that he had completely fulfilled his responsibilities when he set out "alternative dispositions"—dismissal of the charge or, if the Under Secretary read the law correctly, a warning to Iran Air. This order, the ALJ's third, expressly acknowledged that he and the Under Secretary parted ways, not on "the factual dispositive issues," but on an "essentially legal" ruling.

At last, the Under Secretary issued a final order restating, more elaborately, the agency's view that Export Act civil penalties entail no state of mind requirement. Concluding that "to remand, yet again" would be "futile," the Under Secretary imposed a $100,000 civil penalty, the statutory maximum, and suspended Iran Air's export privileges for three months, if Iran Air paid the monetary penalty within thirty days, or for twenty-four months, if Iran Air did not promptly pay the $100,000 penalty.

Invoking this court's review, Iran Air urges that the ALJ correctly construed the Export Act penalty provisions to require, even for civil sanctions, allegation and proof of the exporter's "knowledge." In any event, Iran Air maintains, the Under Secretary may not tamper with an ALJ decision in favor of the exporter.

## III. ANALYSIS

■ *(a) Threshold Issues.* Iran Air challenges the timeliness of the charge and the substantiality of the evidence that no export license was issued for the signal generators. We hold that the charge was timely made because it was filed within the five-year period prescribed in 28 U.S.C. § 2462, although not served until some days thereafter. *Cf.* FED.R.CIV.P. 3 ("A civil action is commenced by filing a complaint with the court."); *West v. Conrail,* 481 U.S. 35, 38–40, 107 S.Ct. 1538, 1541–42, 95 L.Ed.2d 32 (1987) (filing complaint tolls statute of limitations on federally-created right although process not effected until after expiration of statutory period).

We furthermore agree that the record adequately supports the determination that no export license was issued for the shipment of the signal generators to Iran. As the Under Secretary concedes, however, if this were a criminal proceeding, it might be incumbent on the government to show, affirmatively, not only that Iran Air did not obtain a reexport license, but that no reexport license was obtained by anyone for the shipment of the generators.

■ We note too that, although the Export Administration Act expired in September 1990, shortly before the charge letter in this case was filed, and was not reenacted until March 1993, a general savings statute preserves this proceeding. *See* 1 U.S.C. § 109 ("The expiration of a temporary statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the temporary statute shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.").

*(b) The Imposition of Civil Sanctions for Unwitting Violations of the Export Act.* We start with a point not subject to genuine dispute: the regulations under which Iran Air was charged, 15 C.F.R. § 774.1(a) (reexport without specific authorization) and 15 C.F.R. § 787.2 (causing any act prohibited, or the omission of any act required, by the Export Act), express no state of mind specification. In contrast, the predecessor to the current "[c]ausing ... a violation" regulation, 15 C.F.R. § 787.2, explicitly made it unlawful "knowingly to cause" an offending act or omission. *See* 15 C.F.R. § 387.2 (1980). In

1980, the word "knowingly" was deleted from the regulation. *See* 45 Fed.Reg. 84,021, 84,-023 (1980). The essential question, then, is whether the agency, in its reading of the current regulations, reasonably construed the statute, 50 U.S.C.App. § 2410, to allow the imposition of civil sanctions on a strict liability basis.

Section 2410 of the Export Administration Act, in pertinent part, states:

> § 2410.  Violations
>
> (a) In general
>
> Except as provided in subsection (b) of this section, whoever *knowingly* violates ... this Act ... or any regulation ... issued thereunder shall be fined not more than five times the value of the exports involved or $50,000, whichever is greater, or imprisoned not more than 5 years, or both.
>
> (b) Willful violations
>
> (1) Whoever *willfully* violates ... this Act ... or any regulation ... issued thereunder, ...
>
> > (A) except in the case of an individual, shall be fined not more than five times the value of the exports involved or $1,000,000, whichever is greater; and
> >
> > (B) in the case of an individual, shall be fined not more than $250,000, or imprisoned not more than 10 years, or both.
>
> (c) Civil penalties; administrative sanctions
>
> (1) The Secretary [or his designees] ... may impose a civil penalty not to exceed $10,000 for each violation of this Act ... or any regulation ... issued under this Act ..., either in addition to or in lieu of any other liability or penalty which may be imposed, except that the civil penalty for each such violation involving national security controls imposed under [section 2404 of this Act] ... may not exceed $100,000.

50 U.S.C.App. § 2410 (emphasis added). As Iran Air reads these prescriptions, the "In general" caption of subsection (a) controls subsection (c), thus mandating that any charged violation, criminal or civil, be at least "knowing." The Under Secretary, on the other hand, construes subsection (c) as independent of the two subsections that describe criminal infractions and stresses that the civil penalty provision itself includes no *scienter* requirement.

■ The text and history of section 2410 do not yield a clear answer to the question we confront.[5] Our charge, therefore, is to respect the agency's construction of the statute Congress empowered it to administer, so long as that construction is reasonable. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). We are satisfied that the agency's reading is a permissible one.

It is not unusual for Congress to provide for both criminal and administrative penalties in the same statute and to permit the imposition of civil sanctions without proof of the violator's knowledge.[6] Here, the agency maintains, Congress has allowed for an array of penalties for violations of the Export Act:

---

5. A key Senate report, distinguishing criminal from civil penalty provisions, is consistent with the agency's view. *See* S.Rep. No. 169, 96th Cong., 1st Sess. 17 (1979) U.S.Code Cong. & Admin.News 1979, pp. 1147, 1163 ("[C]riminal penalties for willful violations ... are increased to fines of not more than $100,000 or five times the value of the exports, whichever is greater, or up to ten years imprisonment, or both.... Other knowing violations are punishable by fines of up to $50,000 or five times the value of the exports, whichever is greater, or up to five years imprisonment, or both. The bill also contains provisions for civil penalties of up to $10,000 for each violation, and suspension or revocation of authority to export.").

6. Under the Federal Coal Mine Health and Safety Act, for example,

> [a]n operator of a coal mine in which a violation occurred [is] subject to a civil penalty; an operator who "willfully" violate[s] a standard [is] subject to a criminal penalty. Thus, Congress established a strict liability standard to assess civil liability and a willful standard to fix criminal liability against operators.

*United States v. Jones,* 735 F.2d 785, 788 (4th Cir.), *cert. denied,* 469 U.S. 918, 105 S.Ct. 297, 83 L.Ed.2d 232 (1984).

criminal fine and/or imprisonment for the knowing violator; more severe criminal fine and/or a longer prison term for the willful violator; and civil penalties against any violator. Supporting the agency's position that subsection (a)'s knowledge requirement need not be read into subsection (c), Congress expressly provided that nothing in subsection (a) or (b) "limit[s] the power of the Secretary to define by regulations violations under this Act." 50 U.S.C.App. § 2410(b)(5). Furthermore, Congress specifically authorized the executive to establish "levels of civil penalty ... based upon the seriousness of the violation, the culpability of the violator, and the violator's record of cooperation with the Government in disclosing the violation." *Id.* § 2410(c)(4). These provisions appear to leave room for civil penalty regulations that include a knowledge requirement, as the controlling regulation did until 1980, or that allow, as the current version of the controlling regulation does, the imposition of strict liability.

▊ Finally, we are unconvinced by Iran Air's suggestion that it lacked fair notice of the agency's construction. Even if the agency pursued only knowing violators in the past, *but see* JOHN R. LIEBMAN & WILLIAM A. ROOT, UNITED STATES EXPORT CONTROLS xxxii (2d ed. 1989) ("Knowing and willful violations receive, of course, the heaviest sanctions, but unintentional violations are by no means overlooked."),[7] the language of the statute and the pertinent regulations adequately indicated that civil sanctions could be assessed on a strict liability basis. *See* Robert C. Sexton, *Liability of Nonexporters Under the United States Export Laws*, 24 INT'L LAW.

7. One court, we note, appears to have upheld the imposition of *criminal* sanctions on a near strict liability basis. *See United States v. Shetterly,* 971 F.2d 67, 73 (7th Cir.1992) (holding that 50 U.S.C.App. § 2410(a) requires only that the criminal defendant "knowingly exported ... a controlled commodity, without obtaining the appropriate export license" and does not require that "the exporter know[ ] that a license is required"); *cf. Morissette v. United States,* 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952) ("approv[ing]," as constitutional, imposition of strict criminal liability for "public welfare offenses").

8. Dictum in *Spawr Optical Research, Inc. v. Baldrige,* 649 F.Supp. 1366, 1371 (D.D.C.1986), Iran

1029, 1033 (1990) ("The language of the statute and the regulations suggests that civil sanctions are assessed on a 'strict liability' basis.").[8]

*(c) The Under Secretary's Authority to Review ALJ Conclusions of Law.* Section 2412(c)(1) states:

> In any case in which a ... civil sanction ... is sought under ... section 2410 ..., the charged party is entitled to receive a formal complaint specifying the charges and, at his or her request, to contest the charges in a hearing before an administrative law judge. Subject to the provisions of this subsection, any such hearing shall be conducted in accordance with sections 556 and 557 of [the Administrative Procedure Act].... After the hearing, the administrative law judge shall make findings of fact and conclusions of law in a written decision, which shall be referred to the Secretary. The Secretary shall, in a written order, *affirm, modify, or vacate* the decision of the administrative law judge within 30 days after receiving the decision. The order of the Secretary shall be final and is not subject to judicial review, except as provided in paragraph (3).

50 U.S.C.App. § 2412(c)(1) (emphasis added).[9] Iran Air argues that the phrase "affirm, modify, or vacate" severely curtails the Secretary's superintendence of ALJ decisions. As Iran Air puts it: "[I]f the [ALJ] finds for the exporter, as a practical matter, the case is over. If, on the other hand, the ALJ finds for the Agency, the exporter can appeal to the Under Secretary, who is empowered to take one of three actions: to affirm the decision of the ALJ, modify it, or

Air points out, speaks of a *requirement* that the violator facing a civil penalty act "knowingly." For the reasons stated in text, we find that reading incorrect. This dictum, we note, was offered in the context of the court's holding that "civil sanctions ... may be imposed without any finding that the [exporter's] actions constituted a threat to national security." *Id.* That holding is indeed correct.

9. Paragraph (3) provides for an appeal by the charged party, within 15 days after release of the Secretary's order, to the United States Court of Appeals for the District of Columbia Circuit. *See* 50 U.S.C.App. § 2412(c)(3).

vacate it completely." Brief of Appellant at 24; *see also* Reply Brief at 5 ("[T]he Under Secretary does not have the power to reverse, i.e. change a decision in favor of the [alleged violator] to one in favor of the Government."). In other words, the Under Secretary, according to Iran Air, can affirm, modestly adjust, or totally vacate a sanction imposed by the ALJ, but cannot correct the ALJ, to any significant extent, to the charged party's disadvantage, even on a question, such as the principal one presented here, of the official construction of the Export Act.

■ The Under Secretary responds, primarily, that the agency head—the Secretary or his designee—"must be the final administrative arbiter of legal questions concerning the export control program," and therefore must "ha[ve] the power to correct legal errors of the ALJ." Brief for Appellee at 19. We agree. Whatever else Congress meant by the phrase "affirm, modify, or vacate," we hold, it did .not mean to disarm the agency head when the ALJ incorrectly reads the law in the .charged party's favor.

■ It is commonly recognized that ALJs "are entirely subject to the agency on matters of law." Antonin Scalia, *The ALJ Fiasco—A Reprise*, 47 U.CHI.L.REV. 57, 62 (1979) (footnote omitted). As one veteran ALJ explained:

> The basic concept of the independent administrative law judge requires that he conduct the cases over which he presides with complete objectivity and independence. In so operating, however, he is governed, as in the case of any trial court, by the applicable and controlling precedents. These precedents include the applicable statutes and agency regulations, the agency's policies as laid down in its *published* decisions, and applicable court decisions....
>
>   ....
>
> ... [O]nce the agency has ruled on a given matter, [moreover,] it is not open to

reargument by the administrative law judge; ... although an administrative law judge on occasion may privately disagree with the agency's treatment of a given problem, it is not his proper function to express such disagreement in his published rulings or decisions.

Joseph Zwerdling, *Reflections on the Role of an Administrative Law Judge*, 25 AD-MIN.L.REV. 9, 12–13 (1973) (emphasis in original).

Congress, we note, has excluded functions exercised under the Export Act from the Administrative Procedure Act's (APA) governance, except for the specification that hearings before ALJs "shall be conducted in accordance with [5 U.S.C. §§ ] 556 and 557." *See* 50 U.S.C.App. § 2412(c)(1); 130 CONG. REC. 3393 (1984) (statement of Senator Proxmire during revision of Export Act); *Dart v. United States*, 961 F.2d 284, 286 (D.C.Cir. 1992) (foreign policy and national security concerns account for limited application of APA to functions exercised under Export Act). The legislature's decision not to attach to Export Act administration the full APA regimen, however, hardly demonstrates that Congress meant to empower ALJs to speak with finality, trumping the agency head, whenever their law declarations favor the exporter.

We thus fail to see any reliable indication that Congress chose to assign to the ALJ serving as first instance trier under the Export Act a unique competence: authority to rule unreviewably on a matter of law in a manner contrary to the agency head's reading of that same law. Neither the text of section 2412(c)(1) nor the legislative history spells out the extraordinary distinction Iran Air urges us to decree between (plenary) internal agency review of legal rulings against exporters and (practically nonexistent) internal review of legal rulings in their favor.[10] Iran Air relies for its argument

---

10. As to agency review, the legislative history appears only to restate the statute's prescriptions. *See* 130 CONG.REC. 3394 (1984) (statement of Senator Proxmire) ("[Section 2412(c)] provides that the administrative law judge shall make his findings of fact and conclusions of law in a written decision which is then subject to review and affirmation, modification, or nullification by the Secretary."); *id.* at 3397 (statement of Senator Dixon) ("[Under section 2412(c)(1),] [t]he initial decision of the administrative law judge would be appealable to the appropriate secretary, who would be required, in a written

dominantly on *Dart v. United States,* 848 F.2d 217 (D.C.Cir.1988), a decision to which we now turn.

*Dart* involved the OEE's endeavor to impose civil sanctions against an exporter, William C. Dart, for attempting to ship certain high-technology equipment, from Los Angeles to Czechoslovakia, without the license required by the Export Act (the equipment was seized at the L.A. airport). Neither side disputed that knowledge or intent is an element of an "attempt" violation under the Export Act; the case therefore turned on whether Dart in fact knew he needed a special license. After an evidentiary hearing running five days, the ALJ found that Dart did not know he needed a license; accordingly, the ALJ dismissed the case. Despite substantial evidence supporting the ALJ's finding, the designated reviewing official—an Assistant Secretary of Commerce—overturned the ALJ's decision. In a one-page order, the Assistant Secretary found that Dart knew a license was required and had not been obtained; purporting to "modify" the ALJ's decision, the Assistant Secretary imposed a $150,000 fine plus a 15-year ban on Dart's export privileges.

This court, reversing the district court, invalidated the Assistant Secretary's action on two grounds. Section 2412(c)(1), we held first, allows the Assistant Secretary only to "affirm, modify, or vacate" ALJ decisions; the Assistant Secretary therefore exceeded his statutory authority when he overthrew the ALJ's decision, i.e., "reversed" it. *Dart,* 848 F.2d at 228. We also held that, judged by standard agency review criteria, the Assistant Secretary's peremptory reversal of the ALJ's well-supported fact finding "clearly flunks the ... reasoned decisionmaking" test. *Id.* at 231; *see also Dart v. United States,* 961 F.2d 284, 285 (D.C.Cir.1992) (attorney's fees petition; in setting out background, court observed that prior panel ruled in favor of Dart because agency's actions flunked "reasoned decisionmaking" test).

Iran Air understandably emphasizes the first prong on which *Dart* rests, i.e., the absence of a statutory provision for agency head *reversal* of ALJ decisions. The final point made in *Dart,* however—that the Assistant Secretary offered no reasoned explanation for his decision—could hardly be made in this case. The Under Secretary here adequately explained why the statute (50 U.S.C.App. § 2410) permits the imposition of sanctions for unwitting violations of the Export Act.

Concerning the rule declared in *Dart* against agency reversal of ALJ decisions, we are mindful of the context: core fact finding, with no declaration of law implicated. Thus, we emphasized the incongruity of allowing an agency official who has seen only the paper record to substitute his judgment for that of an adjudicatory officer "with independent status, who saw the witnesses' demeanor and gauged their truthfulness." *Dart,* 848 F.2d at 229. And we remarked:

> Rarely if ever would an appellate court reverse a judgment that was in defendant's favor and impose a judgment against him, without remanding the matter to the district court. Yet, that is precisely what the Secretary of Commerce did in Dart's case.

*Id.* at 230.

■ We adhere to the holding in *Dart* that the agency head may not, under section 2412(c)(1), overturn an ALJ's findings of fact and, on that basis, entirely reverse the initial decision, imposing a "diametrically oppos[ite]" result. *Id.* We decline, however, to extend our *Dart* precedent beyond fact findings to questions of agency law or policy. For in that domain, which was not traversed in *Dart,* it would be senseless to give to the ALJ not simply the first, but also the last word.[11]

■ Section 2412(c)(1), in short, does not limit the agency head's authority to check an ALJ's interpretation of the Export Act.

decision ..., to affirm, modify, or vacate the initial decision.").

**11.** The construction Iran Air places on section 2412(c)(1) would mean that members of the regulated class—exporters—might find themselves faced with inconsistent interpretations of law emanating from the Commerce Department. That would leave exporters in a state of insecurity about the ordering of their primary conduct, an outcome Congress could not have willed.

When the Under Secretary ruled on the *scienter* issue in this case, he correctly called upon the ALJ, on remand, to accept the agency's reading of section 2410 as the "law of the case." [12] The ALJ was bound to follow that instruction.

*(d) The Under Secretary's Authority To Review ALJ Sanction Determinations.* As we have just explained, *Dart* obliges the Secretary or his designee to follow the "key findings [of fact]" on which an ALJ bases his rulings, including his sanction determination. *Dart,* 848 F.2d at 231. In the instant case, the ALJ, in his alternative disposition calling for a minimal sanction,[13] made it plain that he appraised the errors in ordering and shipping the generators as inadvertent slips warranting no heavy penalties. Nothing in this record, we further note, indicates that the shipment in question placed national security interests in special danger. We also recall the five-year time lapse between the shipment of the Fluke USA generators to Iran and the institution of administrative proceedings against Iran Air.[14] In addition, we are mindful of OEE's apparent failure to proceed against the Fluke companies.[15] The ALJ was cognizant of these facets of the case.

■ If the Under Secretary had reasons of law or policy for imposing, consistently with the facts of record, the maximum allowable monetary sanction and a correspondingly long suspension period, he utterly failed to disclose those reasons. Indeed, he provided no explanation whatever for the large penalty he ordered. We hold that the ALJ was correct to this extent: *Dart* precluded reversal of his alternative no penalty or minimal sanction assessment "summarily," i.e., without "meaningful explanation." *See supra* p. 1256.

CONCLUSION

■ For the reasons stated, we hold that, under *Dart,* the Under Secretary may not reverse fact findings made by an ALJ, but remains the final administrative arbiter on questions of law and policy. We therefore affirm the Under Secretary's ruling that Iran Air violated the Export Administration Act, but we vacate the sanctions imposed and remand the case to the Under Secretary for a reasoned determination of the appropriate sanction consistent with the ALJ's assessment of the facts and the circumstances of Iran Air's violation.[16]

*Affirmed in part and remanded in part.*

SILBERMAN, Circuit Judge, concurring:

As the government was quick to concede, in the absence of the regulation authorizing penalties for non-knowing or non-willful violations, the Department would not have been entitled to levy a penalty on Iran Air. The government has not always been so forthright. In 1985, the Treasury Department sought and obtained massive fines against scores of American banks for having violated a Treasury Department regulation implementing the Bank Secrecy Act. The Act required banks to report currency transactions in excess of amounts set by the Secretary of the Treasury and provided for civil penalties against those who "willfully violat[ed]" its provisions. 31 U.S.C. § 5321 (1988). In 1980, an amendment to the Department's regulations extended reporting requirements to foreign currency transactions involving domestic banks. "[M]any banks apparently failed to focus on this change and continued to believe that such transactions, particularly when conducted for the bank's own account, continued to be exempt." K. Bachman, A. Henderson & S. Robinson, *Recent Settlements Offer a Guide*

---

12. *See* 18 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4478 (1981) ("Law of the case terminology is often employed to express the principle that inferior tribunals are bound to honor the mandate of superior courts within a single judicial system. Disobedient district judges, for example, are not infrequently corrected for failure to honor the mandate rule as the law of the case on remand. The principle is so straight-forward as to present few interesting problems." (footnotes omitted)).

13. *See supra* pp. 1256, 1257.

14. *See supra* pp. 1255, 1256.

15. *See supra* note 2 and accompanying text.

16. If the Under Secretary finds further fact finding necessary, he may return the case to an ALJ.

to Bank Secrecy Act Compliance, AMERICAN BANKER, April 18, 1986, at 4.

Nevertheless, the Treasury Department collected fines from 38 banking organizations which amounted to $16 million dollars by 1988. See J. Kutler, US Aide Says Banks Doing Better at Reporting Cash Transactions, AMERICAN BANKER, May 26, 1988, at 1. At least 80 banks were under consideration for civil penalties. See St Germain Promises Quick Passage of Measure to Stymie Money Laundering, 46 WASHINGTON FINANCIAL REPORTS (BNA) 614 (1986).

In 1986, the Department obtained an amendment to the statute permitting a lesser penalty for negligent violations. During congressional hearings, the government admitted that the amendment was necessary because the Act permitted fines only for willful violations. See ABA Says Money Laundering Bill Should Concentrate on Intentional Activity, 46 WASHINGTON FINANCIAL REPORTS (BNA) 437 (1986). In passing the amendment, Congress also recognized that the statute did not punish non-willful violations. See S.REP. No. 433, 99th Cong., 2d Sess. 19 (1986). It is unclear how many, if any, banks were then made subject to the lesser penalties. It is clear, however, that based on the government's acknowledgement in this case the original penalties were levied improperly. At the time, banks (particularly large ones) were a popular target of congressional attacks. See 46 WASHINGTON FINANCIAL REPORTS (BNA) 614 (1986) (remarks of Rep. St. Germain); cf. Wachtel v. Office of Thrift Supervision, 982 F.2d 581, 586 (D.C.Cir. 1993). I assume that having taken the position the government did in this case, we will not see a repeat of its posture of 1985.