Lyndon H. LaROUCHE and Democrats for Economic Recovery–LaRouche in 92, Petitioners,

v.

FEDERAL ELECTION COMMISSION, Respondent.

No. 92–1100.

United States Court of Appeals, District of Columbia Circuit.

Argued April 14, 1993.

Decided July 2, 1993.

James F. Schoener, Sarasota, FL, argued the cause for petitioners. With him on the brief was Richard Mayberry, Washington, DC.

Richard B. Bader, Associate General Counsel, Federal Election Com'n, Washington, DC, argued the cause for respondent. With him on the brief were Lawrence M. Noble, General Counsel and Marcus C. Migliore, Attorney, Federal Election Com'n, Washington, DC.

Before: WALD, BUCKLEY and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

Opinion concurring in part and dissenting in part filed by Circuit Judge WALD.

STEPHEN F. WILLIAMS, Circuit Judge:

The Presidential Primary Matching Payment Account Act, 26 U.S.C. §§ 9031–42 ("Matching Payment Act" or "the Act"), sets forth specific requirements that must be satisfied before the Federal Elections Commission certifies a candidate for receipt of matching funds. The key criteria are expressed in § 9033(a), which requires that an applicant "agree" to various commitments to keep and supply records that the Commission might find useful for enforcement of the statutory requirements as to use of campaign funds; and in § 9033(b), which requires a commitment as to prospective use of campaign funds and a representation as to past receipt of a minimum quantity of small campaign contributions from many states.

Although the papers filed by individual petitioner Lyndon H. LaRouche, Jr. and his campaign organization, Democrats for Economic Recovery—LaRouche in 92 (collectively "LaRouche") concededly provided the agreements and commitments required by § 9033, and although the Commission did not contest the truth of LaRouche's representations as to contributions received, it nonetheless denied him certification for matching funds for the 1992 election cycle. In essence, the Commission inferred from various factors in LaRouche's background—including his prior dealings with the Commission and his conviction for fraud partially involving election-related activities—that LaRouche's agreements and commitments were not made "in good faith". Because we agree with LaRouche that the statute gives the Commission no authority to engage in such an assessment of candidates, we reverse.

\* \* \*

On November 18, 1991 LaRouche filed with the FEC to receive matching funds for his campaign. His submission consisted of a Candidate Letter of Agreements and Certifications, along with supporting documentation. Shortly thereafter, the Commission re-

plied that the letter was defective because it contained language limiting LaRouche's personal responsibility under § 9033(a) to furnish financial records and other information for FEC review. LaRouche then submitted a revised letter. The Commission does not dispute that the new submission formally satisfied the statutory and regulatory requirements.

The Commission nonetheless made an initial determination that LaRouche was not eligible for matching funds, which it explained in a Statement of Legal and Factual Reasons. LaRouche submitted responses to the initial determination, including offers to supply whatever documentation the Commission needed to verify the legitimacy of his filings. After reviewing the campaign's responses, the Commission issued a final determination of ineligibility. Statement of Legal and Factual Reasons: Final Determination of FEC Regarding Application of Lyndon H. LaRouche Jr. for Presidential Primary Matching Funds, Joint Appendix ("J.A.") 255 ("Final Determination").

The Commission based its denial on LaRouche's alleged history of non-compliance with the Act, as well as on his criminal indictments and convictions. The Final Determination specifically referred to the following: (1) In 1976 the Commission found LaRouche ineligible for matching funds because he had listed invalid contributions to meet the certification threshold. (2) In 1980 the Commission found LaRouche eligible to receive funds, but a subsequent audit turned up various violations leading to a $15,000 penalty. LaRouche denied personal liability for the penalty, making arguments about the meaning of his candidate letter that appear at best flimsy and at worst casuistical, and paid only when forced to do so as a condition for receiving matching funds in 1984. (3) In the 1984 election cycle LaRouche's campaign vehicle engaged in substantial campaign irregularities, including unauthorized charges against the credit cards of persons who had not agreed to contribute to the campaign; LaRouche refused to turn over documents for purposes of an audit into these events. (4) In 1988, after an audit disqualifying certain purported contributions, followed by

documentation of additional contributions, the Commission certified LaRouche for funds. (5) A federal jury convicted LaRouche in 1988 on several counts of mail fraud. While it is plain that a substantial portion of the evidence involved fraud in the raising of campaign funds, the parties dispute whether such evidence was essential to the conviction. The conviction was indisputably not for violation of election laws. J.A. 265–78. We assume for purposes of this case that the Commission's findings of past misconduct by LaRouche were entirely valid.

The Final Determination is quite clear that the Commission viewed LaRouche's past misconduct as going to the substantiality of LaRouche's agreements and commitments, *not* as bearing on the credibility of his representations as to campaign contributions already received. The Determination said that the Commission need not ignore "behavior which convinces it that *promises* made to secure eligibility to receive public financing are not made in good faith." J.A. 261 (emphasis added). And it concluded that there was "a clear basis ... to determine that Mr. LaRouche's candidate *agreement* cannot be accepted on its face." *Id.* at 278 (emphasis added).

\* \* \*

The statute controlling the Commission's disposition of applications for matching funds provides in pertinent part as follows:

§ 9033 **Eligibility for payments**

(a) **Conditions**

To be eligible to receive payments under section 9037, a candidate shall, in writing—

(1) agree to obtain and furnish to the Commission any evidence it may request of qualified campaign expenses,

(2) agree to keep and furnish to the Commission any records, books, and other information it may request, and

(3) agree to an audit and examination by the Commission under section 9038 and to pay any amounts required to be paid under such section.

(b) **Expense limitation; declaration of intent; minimum contributions**

To be eligible to receive payments under section 9037, a candidate shall certify to the Commission that—

(1) the candidate and his authorized committees will not incur qualified campaign expenses in excess of the limitations on such expenses under section 9035,

(2) the candidate is seeking nomination by a political party for election to the office of President of the United States,

(3) the candidate has received matching contributions which in the aggregate, exceed $5,000 in contributions from residents of each of at least 20 States, and

(4) the aggregate of contributions certified with respect to any person under paragraph (3) does not exceed $250.

26 U.S.C. §§ 9033(a) & (b). Once the candidate "establishes his eligibility" under § 9033, the Act directs the Commission to certify him for matching funds within ten days.

■ The sole issue before us is whether the Matching Payment Act permits the Commission to withhold matching funds on the basis of its assessment of evidence leading it to distrust the agreements and commitments made by an applicant under § 9033(a) & (b). Under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), unless Congress has clearly resolved the issue, we must sustain the Commission's position if it is reasonable. We believe Congress has clearly resolved the issue; we find the language, structure and purpose of the Act to be inconsistent with the Commission's interpretation.

We may dispose at the outset of the Commission's reliance on one of its regulations, 11 CFR § 9033.4(b), which provides that, in evaluating a candidate's submission,

the Commission may consider other information in its possession, including but not limited to past actions of the candidate in an earlier publicly-financed campaign, that is relevant to a determination regarding the candidate's eligibility for matching funds.

Putting aside the elusive question of whether or in what sense LaRouche's 1988 conviction can be said to have been "in [the Commission's] possession", the regulation does not even purport to answer the question before us. It permits the Commission to consider information that is "relevant to a determination regarding the candidate's eligibility", but it doesn't attempt to define what subjects are relevant. Even if it did, the regulation would of course be valid only to the extent that it conformed to the statute.

The language of the statute includes no modifiers requiring that the "agree[ments]" of § 9033(a), or the certification of a commitment to adhere to campaign expenditure limits in § 9033(b)(1), be "in good faith" or trustworthy. It is of course true that Congress could have secured the applicant's legal commitment simply by providing that any application would be deemed to commit the candidate to the obligations stated, so we may infer that Congress sought more. One benefit that Congress secured by requiring express, signed commitments was to focus any applicant on the obligations to be undertaken, which an automatic commitment arising by operation of law would not do. Thus the congressional insistence on explicit agreement by the applicant can be explained without our inferring any general authority in the Commission to evaluate the reliability of the agreement.

LaRouche notes that the Matching Payment Act provides for examination and audit of actual campaign expenses under § 9038, and that in 2 U.S.C. § 437g Congress has expressly granted the Commission post-certification authority to initiate civil and criminal actions and investigations to enforce the provisions of the Act when apprised of past or ongoing violations. He suggests we may infer from those express provisions an intent in § 9033(a) & (b) to withhold authority to make the sort of judgment that the Commission made here. See also 2 U.S.C. § 437d(a)(6) (granting authority to initiate civil enforcement actions); 26 U.S.C. § 9042(c) (providing criminal penalties for supplying false information or failing to supply records or information properly requested by the Commission). The principle of

*expressio unius* is often invoked, see, e.g., *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, —— U.S. ——, ——, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993); *United States v. Lopez*, 938 F.2d 1293, 1297 (D.C.Cir.1991), but also often rejected, see, e.g., *Cheney Railroad v. ICC*, 902 F.2d 66, 68–69 (D.C.Cir.1990) (citing cases). Here we think that the character of the statutory mandate makes the maxim quite suitable, at least as applied to the power here claimed by the Commission. The object of the statute is to enhance the ability of candidates to present their positions and themselves to voters in presidential primaries. Senate Report No. 93–689, 2d Sess. 6 (1974), U.S.C.C.A.N. 5587. One of the characteristics with which voters will surely be concerned is the character and integrity of a candidate and the strength of her commitments to what she says. It would seem to contradict the purpose of enhancing voters' ability to assess candidates to shift any part of that process away from voters and to the Federal Elections Commission.

Moreover, it was Congress's explicit intention that the funds be issued on a non-discriminatory basis. Senate Report No. 93–689 at 10. As we said in *Committee to Elect Lyndon LaRouche v. Federal Election Commission*, 613 F.2d 834 (D.C.Cir.1979) ("*CTEL*"), "we regard it as particularly important to ensure that the Commission is applying the eligibility criteria for primary matching funds in an even-handed manner." *Id.* at 844. Any inquiry into the bona fides of candidates' promises would take the Commission into highly subjective territory that would imperil the assurance of even-handed treatment.

Our prior decisions support, even if they do not compel, a construction of the Matching Payment Act that denies the Commission authority to engage in such subjective inquiries. In *CTEL* LaRouche argued for a somewhat confusing standard for Commission evaluation of his satisfaction of the requirements of §§ 9033(b)(3) & (4), which relate to past campaign contributions received. He claimed that an applicant "need only 'attest authoritatively' in good faith and with knowledge that he has met the fundraising threshold." 613 F.2d at 840. We rejected that standard in favor of an interpretation under which the Commission is, as an initial matter, simply to assess (1) whether the submission adequately documents compliance with the fundraising requirements and (2) whether "[the] submission (or [the] submission together with other reports on file with the Commission) contains patent irregularities suggesting the possibility of fraud." *Id.* at 842. If both inquiries were favorable to the candidate, the Commission was to certify him as eligible; only if the second inquiry showed patent irregularities could the Commission conduct external inquiries as part of the certification process. *Id.*

In reaching this interpretation, we rejected not only the subjective assessment that LaRouche then proposed, but also the Commission's claim that it was free, even absent patent irregularities in the candidate's submissions, to embark on an investigation into his records and to interview supposed contributors. *Id.* at 840. We stressed that both inquiries in the initial phase "involve[d] essentially objective determinations regarding the adequacy of the threshold submission." *Id.* at 844. We said that the "national commitment to open and robust discussion" (citing *New York Times v. Sullivan*) made it especially important to assure that the criteria were applied "in an evenhanded manner", thus supporting our choice of "objective standards" over those proposed by LaRouche. *Id.* at 844. We inferred the limits on the Commission's inquiry from Congress's stated concern for speedy resolution of candidates' applications. *Id.* at 841–44.

Nonetheless, emphasizing the language of *CTEL* allowing Commission consideration of not only the candidate's submission but also "that submission together with other reports on file", *id.* at 842, the Commission claims that it can also deny funding if such information undermines a candidate's promises under § 9033(a) and § 9033(b)(1). Respondent's Brief at 21–22.

■ We find nothing in *CTEL* that supports the Commission's claim and much that militates against it. The Commission's authority to look at its own files for purposes of assessing representations as to objectively

verifiable propositions (what contributions the candidate has received in the past), and to look elsewhere if the submissions and Commission files show "patent irregularities", hardly implies authority to impose comparatively subjective criteria for assessing candidates' promises. The conceded authority is to engage in a counting exercise; the authority now claimed is to evaluate a candidate's character. *CTEL*'s stress on the importance of objective criteria is hardly consistent with the sort of unbounded inquiry the Commission proposes.

Contrary to its belief, the Commission is not assisted by our decision in *In re Carter–Mondale Reelection Committee, Inc.*, 642 F.2d 538 (D.C.Cir.1980). *Carter–Mondale* addressed a request by the Carter–Mondale committee that the court order the Commission to withhold certification (and later, after certification occurred, to reverse certification) of the Reagan–Bush campaign for funds under the Presidential Election Campaign Fund Act, 26 U.S.C. § 9001 et seq., or, in the alternative to order the Commission to start an investigation of certain violations that the plaintiffs alleged the Reagan–Bush campaign had committed or would in the future commit. *Id.* at 541, 542. As the Commission was in fact investigating alleged irregularities, the court held that the issue was within the exclusive jurisdiction of the Commission. *Id.* at 542. We included the following disclaimer:

> We add, however, that we are not interpreting the statute as barring the FEC from deciding as a matter of policy that it will investigate a complaint, a request for funds, or conduct during a political campaign if it reasonably appears that a patent fraud or other major violation of law is being committed....

*Id.* at 544.

The Commission's theory seems to be that, because in *Carter–Mondale* we recognized that the requirements of the Fund Act were primarily forward-looking (i.e., promises to adhere to specified rules), see *id.* at 544–45 n. 8, the dictum must mean that the court believed the Commission was entitled to embark on broad inquiries into the bona fides of promises made under either act. When a

court says that it is "not interpreting" a statute as having a specified meaning, it seems best to take the court at its word—it is simply not passing on the hypothesized interpretation. Apart from that, the court's overall discussion runs against the Commission's reading. First, we noted that "an application of the largely future-looking eligibility criteria ... will depend on investigations conducted *after* certification, whereas compliance with the historical, objective criteria of the [Act] can be measured before certification." *Id.* (citing *CTEL;* emphasis added). Furthermore, the quoted disclaimer is almost immediately preceded by a remark that *CTEL* "precludes withholding funding from a candidate once the *objective* criteria for eligibility are met." *Id.* at 544 (emphasis in original). We went on to say that "Nothing requires the Commission to be ineffective in assuring that only candidates who meet the *objective* criteria of the statute for federal election funds are to receive money from the federal treasury," *id.* at 544–45 & n. 8 (emphases added). In fact, the Fund Act requires certification as to past facts—that no contributions of a specified class "have been or will be accepted by such candidates". 26 U.S.C. § 9003(b)(2). Thus the court may simply have had that backward-looking concern in mind. Alternatively, the court may have considered the possibility that violations committed *within* a campaign might entitle the Commission to withhold future payments as a kind of offset. We find nothing in *Carter–Mondale* to undermine *CTEL*'s general view that in the absence of an explicit authorization by Congress the Commission may not deny funds on the basis of its view of a candidate's subjective intent.

The Commission finally suggests that *Regan v. Taxation with Representation*, 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983), has eliminated the First Amendment considerations underlying the interpretive approach of *CTEL* and *Carter–Mondale*. *Regan* held that Congress could, consistent with the First Amendment, condition tax-exempt status on an entity's refraining from substantial lobbying activity and even that it could impose the condition selectively. See *id.* at 546–51, 103 S.Ct. at 2001–04. But

although the government enjoys greater leeway in provision of benefits than in outright prohibitions, even benefits remain subject to. First Amendment limits. Indeed, the Supreme Court has recently observed that the entire public forum doctrine is in effect a constitutional restriction on the allocation of a government subsidy (in the form of government-owned property). *Rust v. Sullivan,* — U.S. ——, ——, 111 S.Ct. 1759, 1776, 114 L.Ed.2d 233 (1991). And, since *Regan,* the Court has applied First Amendment restraints to the government's conduct as employer, see *Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987), and on the selective provision of tax exemptions, *Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987). *Regan* does not, therefore, eliminate the First Amendment concerns of our prior cases.

■ Of course the Commission is free to insist that the candidate state his agreement to all the statutory requirements, with no impermissible qualifications or omissions, as it did in rejecting LaRouche's initial 1991 filing. There may be other cases where, without assessment of subjective. candidate intent, the Commission might conceivably withhold funds despite formal compliance with the statutorily expressed criteria. Suppose, for example, a candidate, like a. melodrama villain, whispers an aside that he intends to welsh on his commitments. Or suppose a candidate has failed to pay a penalty assessed for violations in a previous ·campaign cycle. Compare *Spannaus v. FEC,* 641 F.Supp. 1520 (S.D.N.Y.1986). We do not pass upon these hypotheticals. The key here is that the Commission is not authorized to appraise candidates' good faith, honesty, probity or general reliability when reviewing the agreements and other forward-looking commitments required by § 9033(a) & (b).

\* \* \*

Petitioners ask that we direct the Commission "to certify [their] threshold submission for disbursement by the U.S. Treasury, for all qualified uses to which [the campaign] is by law entitled." Petitioners' Brief at 48. As the Commission has offered only one basis for withholding certification, which we find invalid, we reverse and remand with instructions to certify and for such other proceedings as may be appropriate.

*So ordered.*

WALD, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that the Federal Elections Commission ("FEC" or "Commission") exceeded its statutory authority in ·its investigation of Mr. LaRouche, but I believe it did so only in its consideration of the convictions for mail fraud, conspiracy to commit mail fraud, and conspiracy to defraud the Internal Revenue Service ("IRS")—convictions not directly and unmistakably related to the conduct of his prior campaigns.[1] I do not believe that the statute requires that the FEC, in determining a candidate's eligibility for public monies, disregard evidence in its own files that indicates that a candidate may well intend to defraud the Commission—and the American taxpayer.

Congress passed the Presidential Primary Matching Payment Account Act, 26 U.S.C. §§ 9031–42 ("Matching Payment Act"), as part of the Federal Election Campaign Act Amendments of 1974, in the belief that Congress had "'an interest, if not a duty, to protect the integrity of its political processes from frivolous or fraudulent candidacies.'" S.REP.No. 689, 93d Cong., 2d Sess. 7 (1974),

---

1. The FEC claims, and LaRouche disputes, that his convictions on thirteen counts of fraud and conspiracy to defraud involved fundraising from his 1984 campaign. The Commission's claim is constructed from "the indictment, testimony at trial, the jury instructions, and the appeal." When the Commission concocts a theory of liability that relies on the court's denial of the defense motion to instruct the jury on the exclusion of the fundraising practices of political committees, it has strayed not only beyond its area of recognized expertise, but beyond the "circumscribed" inquiry into "patent irregularities" permissible during the certification process. *See Committee to Elect Lyndon LaRouche v. FEC,* 613 F.2d 834, 841, 842 (D.C.Cir.1979), *cert. denied,* 444 U.S. 1074, 100 S.Ct. 1019, 62 L.Ed.2d 756 (1980) (*CTEL*): We are not faced with the permissibility of the Commission's consideration of a criminal conviction for a direct violation of federal election laws, which I consider a separate and open question.

U.S.C.C.A.N. at 5593, *reprinted in* FEC, *Legislative History of Federal Election Campaign Act Amendments of 1974,* at 103 (1977) (quoting *Bullock v. Carter,* 405 U.S. 134, 145, 92 S.Ct. 849, 857, 31 L.Ed.2d 92 (1971)) ("Senate Report"); H.R.REP. No. 1239, 93d Cong., 2d Sess. 13 (1974), *reprinted in* FEC, *Legislative History of Federal Election Campaign Act Amendments of 1974,* at 647 (1977) (same). In administering this Act, as well as other election laws, the Commission has broad administrative, policy, investigative, supervisory and oversight powers. *See, e.g.,* 2 U.S.C. § 437c (directing Commission to "administer, seek to obtain compliance with, and formulate policy with respect to" election laws), § 437d(a) (outlining Commission's investigatory powers), § 438(b) (outlining Commission's duties, including the conduct of audits and field investigations of certain political committees); *see also Buckley v. Valeo,* 424 U.S. 1, 109, 96 S.Ct. 612, 677, 46 L.Ed.2d 659 (1976) (Commission has "primary and substantial responsibility" for enforcing the 1974 election laws). The Matching Payment Act specifically empowers the Commission to certify the eligibility of a presidential primary candidate to receive matching funds. 26 U.S.C. § 9036(a). One of the two criteria for eligibility, as the majority notes, is the candidate's promises to fulfill certain reporting requirements and to cooperate with the Commission in its investigations. *Id.* § 9033(a). The statute directs the Commission to certify a candidate only after he "establishes" his eligibility, *id.* § 9036(a), not after he merely attests to it. Indeed, the majority accepts the Commission's determination that the candidate whose agreements contain impermissible qualifications has not "established" his eligibility. Majority opinion ("Maj. op.") at 1269. I believe the Commission is entitled to make the same determination not only as to a candidate whose statutory promises are contradicted by his whispered aside that he intends to welsh on his commitments, *see* Maj. op. at 1269, but also a candidate with documented overt acts of welshing on his similar commitments to the Commission in four out of four prior elections.

As I have said before with regard to a related election statute, I cannot read this Act to require that the Commission, in making its certification, "deliberately blind itself" to "materials that suggest on their face that the candidate intends to violate ... the eligibility requirements of public funding." *In re Carter–Mondale Reelection Comm.,* 642 F.2d 538, 550, 551 (D.C.Cir.1983) (per curiam) (Wald, J., concurring in decision to affirm) (*Carter–Mondale*). To the contrary, I believe the statute gives the Commission the authority, if not the duty, to consider a candidate's filings and conduct in past publicly-financed campaigns when certifying her eligibility to receive further public funds.

In *Committee to Elect Lyndon LaRouche v. FEC,* 613 F.2d 834, 845–46 (D.C.Cir.1979), *cert. denied,* 444 U.S. 1074, 100 S.Ct. 1019, 62 L.Ed.2d 756 (1980) (*CTEL*), we held that the Act's policy favoring prompt payments required that, during the certification process, the FEC's inquiry into a candidate's eligibility be "circumscribe[d] *to a certain extent.*" *Id.* at 841 (emphasis added). We refused, however, to proscribe any and all Commission inquiry at this point, rejecting the notion that the FEC was confined to "the quite limited task of rubberstamping notarized statements of eligibility." *Id.* Instead, we concluded that, "where [the candidate's] submission, (*or that submission together with other reports on file with the Commission*) contain[ed] patent irregularities suggesting the possibility of fraud," the Commission was empowered "to conduct a properly circumscribed investigation...." *Id.* at 842 (emphasis added). Here, I believe the Commission was entitled to conclude that its own records documenting Mr. LaRouche's long trail of broken promises to the FEC revealed the requisite "patent irregularities suggesting the possibility of fraud."

I recognize that the *CTEL* court expressed, and the later *Carter–Mondale* court echoed, a "preference for the application of objective standards" in the Commission's determination of a candidate's eligibility for public funds. *See Carter–Mondale,* 642 F.2d at 551 (Wald, J., concurring); *id.* at 544 n. 8; *CTEL,* 613 F.2d at 844. Here, a circumscribed inquiry into Mr. LaRouche's documented performance under the Act is consistent with that preference, as it would rely

almost entirely on objective and quantifiable evidence. Determining that a candidate has filed false reports or defaulted on or repudiated his promises to the Commission in *four* consecutive elections certainly falls within the Commission's "conceded authority ... to engage in a counting exercise." *See* Maj. op. at 1268. And to the limited extent that the Commission's resulting conclusion as to the validity of the candidate's assurances must involve some degree of subjective judgment, the overall inquiry would still not entail either of the dangers the *CTEL* court associated with open-ended subjective inquiries. First, it would not require a "lengthy investigation[ ]," *CTEL*, 613 F.2d at 844, that would contravene the Act's policy of "prompt payment." Second, so long as the Commission bases its determination on specific, identifiable factors in the record, it is possible to review—and to ensure—the "even-handed[ness]" with which it applies the eligibility criteria to different candidates. *Id.; see also* Senate Report at 8–10, FEC Legislative History at 103–05 (expressing concern for fair treatment for minor party candidates). And here the Commission's actions stem from its own interpretation of its responsibilities and its own concerns about the candidate's eligibility, not from an opponent's prodding, *cf. Carter–Mondale*, 642 F.2d at 543 (opposing campaign committee's complaint "highly speculative"), so it presents little danger of partisan motivation.

In the face of the Matching Payment Act's silence on the permissible scope of the FEC's pre-certification inquiry, we determined that the inquiry must be "circumscribed." *CTEL*, 613 F.2d at 842. The Commission has accordingly interpreted the Act and our case law to permit it to consider a candidate's conduct in prior publicly-funded campaigns, and to deny eligibility based on the most egregious past violations. *Explanation and Justification of Title 26 Regulations*, 52 Fed. Reg. 20,864, 20,868–69 (June 3, 1987). Given the deference we owe the Commission's construction and administration of the statute, *see FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981), I cannot conclude that this interpretation was "arbitrary, capricious, or otherwise not in accordance with the law."

*See* 26 U.S.C. § 9041; 5 U.S.C. § 706(2)(A); *see also Common Cause v. FEC*, 842 F.2d 436, 439–40 (D.C.Cir.1988) (quoting *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984)) ("[W]here 'the statute and its history are silent or ambiguous with respect to a specific issue,' the [Commission's] construction, if reasonable, must ordinarily be honored."). Nor do I believe that expeditious, nondiscriminatory inquiries into candidates' past compliance with federal election requirements, followed by the evenhanded refusal to certify serious violators, runs afoul of the First Amendment. *Cf. Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987) (discriminatory tax exemptions based on content of publications incompatible with First Amendment). Accordingly, I would remand to the Commission for an eligibility determination that considered Commission documentation of Mr. LaRouche's prior publicly-financed campaigns, but not his only arguably related convictions.